# 16-3945-cv(L),
## 17-1625 (CON), 17-1722 (CON)

# United States Court of Appeals
## for the
## Second Circuit

VIRGINIA L. GIUFFRE,

*Plaintiff-Appellee,*

– v. –

GHISLAINE MAXWELL,

*Defendant,*

– v. –

SHARON CHURCHER, JEFFREY EPSTEIN,

*Respondents,*

ALAN M. DERSHOWITZ, MICHAEL CERNOVICH, dba CERNOVICH MEDIA,

*Intervenors-Appellants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
### Volume VI of VI (Pages A-1177 to A-1436) [REDACTED]

PAUL CASSELL, ESQ., PROFESSOR
UNIVERSITY OF UTAH
S.J. QUINNEY COLLEGE OF LAW
332 South 1400 East, Room 101
Salt Lake City, Utah 84124
(801) 585-5202

– and –

BOIES SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
(954) 356-0011

*Attorneys for Plaintiff-Appellee*

EMERY CELLI BRINCKERHOFF & ABADY LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

*Attorneys for Intervenor-Appellant
Alan M. Dershowitz*

i

# Table of Contents

**Page**

District Court Docket Entries ..................................................... A-1

Complaint, Dated September 21, 2015 ..................................... A-112

Protective Order of the Honorable Robert W. Sweet,
    Dated March 17, 2016............................................................. A-124

Transcript of Proceedings before the Honorable
    Robert W. Sweet, Dated April 21, 2016 ................................ A-130

Transcript of Proceedings before the Honorable
    Robert W. Sweet, Dated June 23, 2016.................................. A-159

Minute Entry of Oral Argument before the Honorable
    Robert W. Sweet, Entered on June 27, 2016.......................... A-194

Standing Order of the Honorable Robert W. Sweet,
    Dated August 9, 2016............................................................. A-196

Notice of Motion by Proposed Intervenor Alan M. Dershowitz
    to Intervene and to Unseal Certain Documents Previously
    Filed with the District Court, Dated August 11, 2016 ........... A-197

Declaration of Proposed Intervenor Alan M. Dershowitz
    in Support of his Motion to Intervene and Unseal,
    Dated August 11, 2016
    (Reproduced in confidential appendix at pp.
    A-654 to A-671)

    Exhibit A to Dershowitz Declaration -

        (i) E-mail Exchange between Sharon Churcher
        and Virginia Giuffre, Dated from May 10, 2011
        to May 12, 2011
        (Reproduced in confidential appendix at pp.
        A-672 to A-674)

        (ii) E-mail Exchange between Sharon Churcher
        and Virginia Giuffre, Dated June 8, 2011
        (Reproduced in confidential appendix at pp.
        A-675 to A-677)

ii

Page

Exhibit B to Dershowitz Declaration -
Excerpts of "The Billionaire's Playboy Club",
by Virginia Roberts
(Reproduced in confidential appendix at pp.
A-678 to A-819)

Exhibit C to Dershowitz Declaration -
Complaint and Demand for Jury Trial, in *Jane Doe No. 102 v. Epstein* (U.S. District Court, Southern District of Florida Case No. 09-cv-80656), Dated May 1, 2009.......................... A-199

Exhibit D to Dershowitz Declaration -
Order of the Honorable Kenneth A. Mara Denying Petitioners' Motion to Join Under Rule 21 and Motion to Amend Under Rule 15, in *Jane Doe 1 et ano. v. USA* (U.S. District Court, Southern District of Florida Case No. 08-cv-80736), Dated April 6, 2015 ................................. A-228

Exhibit E to Dershowitz Declaration -
Subpoena to Attend and Produce ........................................... A-239

Exhibit F to Dershowitz Declaration -
Motion to Quash for Protective Order Regarding Subpoena Served on Non-Party Jane Doe No. 3, in *Edwards v. Dershowitz* (Circuit Court of the 17th Judicial Circuit, Broward County, Florida Case No. 15-000072), Dated April 9, 2015................................................................. A-245

   Exhibit 1 to Motion to Quash -
   "Florida judge tosses 'sex slave' claims involving Prince Andrew, Alan Dershowitz", by Oren Yaniv and Dareh Gregorian (*NY Daily News*, April 7, 2015) ............. A-260

   Exhibit 2 to Motion to Quash -
   "Alan Dershowitz: 'Sex slave' accuser is serial liar, prostitute", by Bob Norman (www.local10.com, January 22, 2015) ................................................................. A-265

   Exhibit 3 to Motion to Quash -
   Transcript of CNN News Segment,
   Dated January 6, 2015 ........................................................ A-269

   Exhibit 4 to Motion to Quash -
   Transcript of Australian Broadcasting System News Segment, Dated January 6, 2015 ........................................ A-278

iii

**Page**

Exhibit 5 to Motion to Quash -
"After Vindication, Alan Dershowitz Vows to Sue
Sex Accuser in Court", by Ilan Shavit
(www.jewishbusinessnews.com, April 8, 2015) ................ A-282

Exhibit 6 to Motion to Quash -
Subpoena to Attend and Produce, Dated March 30, 2015 .... A-286

Exhibit 7 to Motion to Quash -
"Alan Dershowitz Wants Attorney Behind 'Totally False'
Underage Sex Claims to Be Disbarred", by Hilary Lewis
(*The Hollywood Reporter*, January 5, 2015) ...................... A-300

Exhibit 8 to Motion to Quash -
Affidavit of Jane Doe No. 3 in Support of Motion to
Quash or for Protective Order, Sworn to April 9, 2015 ..... A-304

Exhibit 9 to Motion to Quash -
Non-Party Jane Doe No. 3's Objections to Defendant
Alan Dershowitz's Subpoena *duces tecum*,
Dated April 9, 2015 ........................................................... A-307

   Exhibit 1 to Objections to Subpoena *duces tecum* -
   Transcript of Australian Broadcasting System News
   Segment, Dated January 6, 2015
   (Reproduced in non-confidential appendix at
   pp. A-278 to A-281)

   Exhibit 2 to Objections to Subpoena *duces tecum* -
   "Florida judge tosses 'sex slave' claims involving
   Prince Andrew, Alan Dershowitz", by Oren Yaniv and
   Dareh Gregorian (NY Daily News, April 7, 2015)
   (Reproduced in non-confidential appendix at
   pp. A-260 to A-264)

Exhibit G to Dershowitz Declaration -
Deposition Transcript of Virginia Roberts Giuffre, in
*Edwards v. Dershowitz* (Circuit Court of the 17th Judicial
Circuit, Broward County, Florida Case No. 15-000072),
Dated January 16, 2016
(Reproduced in confidential appendix at pp.
A-820 to A-1042)

iv

**Page**

Exhibit H to Dershowitz Declaration -
"Lawyers Acknowledge Mistake in Filing Sexual
Misconduct Charges Against Professor Dershowitz"
(Press Release, April 8, 2016)................................. A-330

Exhibit I to Dershowitz Declaration -
"Investigation by Former FBI Director Louis Freeh
Concludes that the Totality of the Evidence Refutes
Allegations Made Against Professor Dershowitz"
(Press Release, April 8, 2016)................................. A-333

Exhibit J to Dershowitz Declaration -
Notice of Withdrawal of Motion for Partial Summary
Judgment, in *Edwards v. Dershowitz* (Circuit Court of the
17th Judicial Circuit, Broward County, Florida Case No.
15-000072), Dated April 8, 2016 ........................... A-338

Exhibit K to Dershowitz Declaration -

(i) "Settlement Reached In Litigation Between Alan
Dershowitz, Paul Cassell, And Bradley Edwards", by
David Lat (www.abovethelaw.com, April 8, 2016) ........... A-342

(ii) "Dershowitz Settles Sex Case, But Is He Vindicated?",
by Vivia Chen (www.law.com, April 10, 2016) ................ A-351

(iii) "Alan Dershowitz Extends Truce Offer to
David Boies Amid Bitter Feud", by John Lamparski
(Bloomberg Law, April 11, 2016)...................................... A-357

(iv) "Did Dershowitz Pay Big Bucks to Settle Sex Case?",
by Vivia Chen (*The American Lawyer*, April 11, 2016).... A-364

(v) "Epstein victim's attorneys clarify statement",
by Michele Dargan (*Palm Beach Daily News*,
April 11, 2016) ................................................................. A-366

(vi) "Defamation case settled over sex-misconduct
accusations against lawyer Alan Dershowitz",
by Jay Weaver (*Miami Herald*, April 11, 2016) ................ A-367

(vii) "Alan Dershowitz and 2 Other Lawyers Settle Suite
and Counter Claim", by Barry Meier (*The New York
Times*, April 12, 2016)...................................................... A-375

(viii) "What's Everyone Hiding in the Dershowitz Case?",
by Vivia Chen (*The American Lawyer*, April 14, 2016).... A-378

v

**Page**

(ix) "Dershowitz, Croghan, DeRosa: Busy season in Palm Beach court cases", by Michele Dargan (*Palm Beach Daily News*, May 1, 2016).................................................. A-380

Exhibit L to *Dershowitz* Declaration -
Protective Order of the Honorable Robert W. Sweet,
Dated March 17, 2016
(Reproduced in non-confidential appendix at pp.
A-124 to A-129)

Exhibit M to Dershowitz Declaration -
Reply Memorandum of Law in Further Support of
Non-Party Sharon Churcher's Motion to Quash
Subpoena, Dated July 5, 2016
(Reproduced in confidential appendix at pp.
A-1043 to A-1057)

Exhibit N to Dershowitz Declaration -
E-mail from Susan Moss to Thomas E. Scott,
Steven R. Safra, Richard Simpson and Others,
Dated November 4, 2015 ....................................................... A-382

Supplemental Declaration of Proposed Intervenor Alan M.
Dershowitz in Support of his Motion to Intervene
and Unseal, Dated August 19, 2016...................................... A-384

Declaration of Sigrid S. McCawley, for Plaintiff, in Opposition
to Proposed Intervenor Alan M. Dershowitz's Motion
to Intervene and Unseal, with Exhibits 1 through 23,
Dated August 29, 2016
(Reproduced in confidential appendix at pp.
A-1058 to A-1254)

Declaration of Paul G. Cassell, for Plaintiff, in Opposition
to Proposed Intervenor Alan M. Dershowitz's Motion
to Intervene and Unseal, with Exhibits 1 through 4,
Dated August 29, 2016
(Reproduced in confidential appendix at pp.
A-1255 to A-1333)

Reply Declaration of Proposed Intervenor Alan M. Dershowitz
in Further Support of his Motion to Intervene and Unseal,
Dated September 14, 2016
(Reproduced in confidential appendix at pp.
A-1334 to A-1360)

vi

Page

Exhibit O to Dershowitz Reply Declaration -
Excerpts of Deposition Transcripts of Paul G. Cassell, in
*Edwards v. Dershowitz* (Circuit Court of the 17th Judicial
Circuit, Broward County, Florida Case No. 15-000072),
Dated October 16, 2015, and October 17, 2015 .................... A-388

Exhibit P to Dershowitz Reply Declaration -
Excerpts of Deposition Transcript of Alan M. Dershowitz,
in *Edwards v. Dershowitz* (Circuit Court of the 17th Judicial
Circuit, Broward County, Florida Case No. 15-000072),
Dated October 16, 2015 ....................................................... A-396

Exhibit Q to Dershowitz Reply Declaration -
Affidavit of Juan P. Alessi, in *Jane Doe No. 2 v. Epstein*
(U.S. District Court, Southern District of Florida Case
No. 08-cv-80119), Sworn to January 13, 2016 ..................... A-400

Exhibit R to Dershowitz Reply Declaration -
Excerpts of Deposition Transcript of Sarah Kellen, in *Jane
Doe 2 v. Epstein* (U.S. District Court, Southern District of
Florida Case No. 08-cv-80119), Dated March 24, 2010 ........ A-406

Exhibit S to Dershowitz Reply Declaration -

    (i) Letter from Alan M. Dershowitz to Jack Scarola,
    Dated August 15, 2011 ...................................................... A-410

    (ii) Letter from Jack Scarola to Alan M. Dershowitz,
    Dated August 23, 2011 ...................................................... A-412

    (iii) E-mail from Alan M. Dershowitz to Mary E. Pirrotta,
    Dated September 7, 2011 ................................................... A-413

Exhibit T to Dershowitz Reply Declaration -
"Teenage girl recruited by paedophile Jeffrey Epstein
reveals how she twice met Bill Clinton", by Sharon
Churcher (*Daily Mail*, March 5, 2011) ................................ A-414

Exhibit U to Dershowitz Reply Declaration -
Excerpts of Deposition Transcripts of Alfredo Rodriguez,
in *Jane Doe No. 2 v. Epstein* (U.S. District Court,
Southern District of Florida Case No. 08-cv-80119),
Dated July 29, 2009, and August 7, 2009 .............................. A-423

Exhibit V to Dershowitz Reply Declaration -
Transcript of Telephone Interview with Virginia Roberts,
Dated April 7, 2011 .............................................................. A-430

**Page**

Exhibit W to Dershowitz Reply Declaration -
Redacted Affidavit of Virginia Roberts,
Sworn to January 19, 2015 ................................................... A-454

 Exhibit 1 to Roberts Redacted Affidavit -
 Letter from A. Marie Villafana to Virginia Roberts,
 Dated September 3, 2008 ................................................... A-469

 Exhibit X to Dershowitz Reply Declaration -
 Transcript of Non-Party Virginia Roberts' Emergency
 Motion to Seal, in *Edwards v. Dershowitz* (Circuit Court
 of the 17th Judicial Circuit, Broward County, Florida Case
 No. 15-000072), Dated December 18, 2015 ......................... A-474

Notice of Appeal by Proposed Intervenor Alan M. Dershowitz,
 Dated November 21, 2016 ................................................... A-508

Notice of Motion by Proposed Intervenor Cernovich Media
 to Intervene and to Unseal Certain Documents Previously
 Filed with the District Court, Dated January 19, 2017 ........... A-509

Declaration of Michael Cernovich, for Proposed Intervenor
 Cernovich Media, in Support of its Motion to Intervene
 and Unseal, Dated January 19, 2017 .................................... A-512

Declaration of Sigrid S. McCawley, for Plaintiff, in Opposition
 to Proposed Intervenor Cernovich Media's Motion to
 Intervene and Unseal, Dated February 2, 2017 ..................... A-514

 Exhibit 1 to McCawley Declaration -
 Transcript of Australian Broadcasting System News
 Segment, Dated January 6, 2015
 (Reproduced in non-confidential appendix at pp.
 A-278 to A-281)

 Exhibit 2 to McCawley Declaration -
 "Alan Dershowitz: 'Sex slave' accuser is serial liar,
 prostitute", by Bob Norman (www.local10.com,
 January 22, 2015)
 (Reproduced in non-confidential appendix at pp.
 A-265 to A-268)

Declaration of Jay M. Wolman, for Proposed Intervenor
 Cernovich Media, in Further Support of its Motion to
 Intervene and Unseal, Dated February 9, 2017 ..................... A-528

viii

**Page**

Exhibit 1 to Wolman Declaration -
"Pedophile Jeffrey Epstein is accused of luring an underage
girl into his elaborate sex trafficking enterprise under the
guise of using his wealth and connections to get her into
a prestige NYC college", by Martin Gould (*Daily Mail*,
January 27, 2017) .................................................. A-530

Exhibit 2 to Wolman Declaration -
"High-profile cases: Crimes that shook Palm Beach through
the decades", by Palm Beach Daily News Staff (*Palm Beach
Daily News*, February 2, 2017) ............................................ A-563

Exhibit 3 to Wolman Declaration -
Cast and Crew of "Silenced: Our War on Free Speech"
(www.silencedmovie.com).................................................. A-572

Memorandum of Law by Proposed Intervenor Alan M.
  Dershowitz in Support of Proposed Intervenor Cernovich
  Media's Motion to Intervene and Unseal,
  Dated February 10, 207 ........................................... A-579

Transcript of Proceedings before the Honorable
  Robert W. Sweet, Dated February 16, 2017 ......................... A-582

Plaintiff's Motion to Exclude Proposed Intervenor Cernovich
  Media's Opposition to Notice of Intent to Request Redaction
  of February 16, 20107 Hearing Transcript,
  Dated March 21, 2017........................................... A-645

Sealed Opinion of the Honorable Robert W. Sweet,
  Dated March 22, 2017
  (Reproduced in confidential appendix at pp.
  A-1361 to A-1436)

Letter from Eric J. Feder to the Honorable Robert W. Sweet,
  Dated May 4, 2017.................................................. A-648

Notice of Appeal by Proposed Intervenor Cernovich Media,
  Dated May 31, 2017............................................. A-652

## **Confidential Material**

Declaration of Proposed Intervenor Alan M. Dershowitz
  in Support of his Motion to Intervene and Unseal,
  Dated August 11, 2016........................................ A-654

ix

Page

Exhibit A to Dershowitz Declaration -

(i) E-mail Exchange between Sharon Churcher
and Virginia Giuffre, Dated from May 10, 2011
to May 12, 2011................................................................ A-672

(ii) E-mail Exchange between Sharon Churcher
and Virginia Giuffre, Dated June 8, 2011 ......................... A-675

Exhibit B to Dershowitz Declaration -
Excerpts of "The Billionaire's Playboy Club",
by Virginia Roberts .................................................................. A-678

Exhibit G to Dershowitz Declaration -
Deposition Transcript of Virginia Roberts Giuffre, in
*Edwards v. Dershowitz* (Circuit Court of the 17th Judicial
Circuit, Broward County, Florida Case No. 15-000072),
Dated January 16, 2016........................................................... A-820

Exhibit M to Dershowitz Declaration -
Reply Memorandum of Law in Further Support of
Non-Party Sharon Churcher's Motion to Quash Subpoena,
Dated July 5, 2016................................................................... A-1043

Declaration of Sigrid S. McCawley, for Plaintiff, in Opposition
to Proposed Intervenor Alan M. Dershowitz's Motion to
Intervene and Unseal, Dated August 29, 2016..................... A-1058

Exhibit 1 to McCawley Declaration -
"Alan Dershowitz: 'Sex slave' accuser is serial liar,
prostitute", by Bob Norman (www.local10.com,
January 22, 2015) ................................................................... A-1063

Exhibit 2 to McCawley Declaration -
Flight Logs ......................................................................... A-1067

Exhibit 3 to McCawley Declaration -
"Criticism Prompts 'GMA' to Flip Fuhrman's Title, Ax
Pay", by Gail Shister (*Miami Herald*, March 18, 2000) ...... A-1077

Exhibit 4 to McCawley Declaration -
Excerpts of Deposition Transcript of Virginia Roberts
Giuffre, in *Edwards v. Dershowitz* (Circuit Court of the 17th
Judicial Circuit, Broward County, Florida Case No.
15-000072), Dated January 16, 2016 ................................... A-1081

x

Page

Exhibit 5 to McCawley Declaration -
"Kiddie Porn, Sex Toys & Worse: Clinton Pal Jeffrey
Epstein's Pedophile Palace Revealed", by Radar Staff
(www.radaronline.com, July 7, 2016)................................. A-1087

Exhibit 6 to McCawley Declaration -
Excerpts of Deposition Transcript of Juan P. Alessi, in
*Jane Doe No. 2 v. Epstein* (U.S. District Court, Southern
District of Florida Case No. 08-cv-80119),
Dated September 8, 2009 .................................................... A-1090

Exhibit 7 to McCawley Declaration -
"Alan Dershowitz: 'Sex slave' accuser is serial liar,
prostitute", by Bob Norman (www.local10.com,
January 22, 2015) ................................................................ A-1095

Exhibit 8 to McCawley Declaration -
Excerpts of Deposition Transcripts of Alfredo Rodriguez,
in *Jane Doe No. 2 v. Epstein* (U.S. District Court,
Southern District of Florida Case No. 08-cv-80119),
Dated July 29, 2009 and August 7, 2009 ............................ A-1099

Exhibit 9 to McCawley Declaration -

(i) Excerpts of Deposition Transcript of Nadia
Marcinkova, in *Jane Doe v. Epstein* (U.S. District Court,
Southern District of Florida Case No. 08-cv-80893),
Dated April 13, 2010 ....................................................... A-1107

(ii) Excerpts of Deposition Transcript of Sarah Kellen,
in *Jane Doe 2 v. Epstein* (U.S. District Court, Southern
District of Florida Case No. 08-cv-80119),
Dated March 24, 2010 ..................................................... A-1111

(iii) Excerpts of Deposition Transcript of Adriana Ross,
in *Jane Doe v. Epstein* (U.S. District Court, Southern
District of Florida Case No. 08-cv-80893),
Dated March 15, 2010 ..................................................... A-1117

Exhibit 10 to McCawley Declaration -

(i) Excerpts of Deposition Transcript of Joseph Recarey,
Dated June 21, 2016 ....................................................... A-1121

(ii) "How Alan Dershowitz bullied rape victims to protect
a serial child molester", by Rania Khalek (*The Electronic
Intifada*, January 10, 2015).............................................. A-1126

xi

**Page**

Exhibit 11 to McCawley Declaration -
Notice of Appeal, in *Edwards v. Dershowitz* (Circuit Court
of the 17th Judicial Circuit, Broward County, Florida Case
No. 15-000072), Dated May 27, 2016 ................................ A-1131

Exhibit 12 to McCawley Declaration -
Order of the Honorable Thomas M. Lynch, IV on Boies,
Schiller & Flexner LLP and Jane Doe No. 3's Motions to
Quash Subpoenas or for Protective Order, in *Edwards v.
Dershowitz* (Circuit Court of the 17th Judicial Circuit,
Broward County, Florida Case No. 15-000072),
Dated November 12, 2015 ................................................. A-1136

Exhibit 13 to McCawley Declaration -
Excerpts of Deposition Transcript of Virginia Giuffre,
Dated May 3, 2016 ............................................................. A-1139

Exhibit 14 to McCawley Declaration -
Excerpts of Transcript of Non-Party Virginia Roberts'
Emergency Motion to Seal, in *Edwards v. Dershowitz*
(Circuit Court of the 17th Judicial Circuit, Broward County,
Florida Case No. 15-000072), Dated December 18, 2015 ... A-1142

Exhibit 15 to McCawley Declaration -
Order of the Honorable Thomas M. Lynch, IV on Boies,
Schiller & Flexner LLP's Motion to Seal, in *Edwards v.
Dershowitz* (Circuit Court of the 17th Judicial Circuit,
Broward County, Florida Case No. 15-000072),
Dated December 18, 2015 .................................................. A-1149

Exhibit 16 to McCawley Declaration -
Motion to Strike and for Sanctions, in *Edwards v.
Dershowitz* (Circuit Court of the 17th Judicial Circuit,
Broward County, Florida Case No. 15-000072),
Dated December 16, 2015 .................................................. A-1151

Exhibit 17 to McCawley Declaration -
Sealed, Unredacted Supplemental Motion to Strike and for
Sanctions, in *Edwards v. Dershowitz* (Circuit Court of the
17th Judicial Circuit, Broward County, Florida Case No.
15-000072), Dated January 28, 2016 ................................. A-1160

Exhibit 18 to McCawley Declaration -
Transcript of Proceedings before the Honorable
Robert W. Sweet, Dated March 17, 2016 ........................... A-1168

xii

**Page**

Exhibit 19 to McCawley Declaration -
Transcript of Proceedings before the Honorable
Robert W. Sweet, Dated April 21, 2016 ............................ A-1204

Exhibit 20 to McCawley Declaration -
"Alan Dershowitz: 'Sex slave' accuser is serial liar,
prostitute", by Bob Norman (www.local10.com,
January 22, 2015) ............................................................. A-1234

Exhibit 21 to McCawley Declaration -
Transcript of CNN News Segment, Dated January 6, 2015. A-1238

Exhibit 22 to McCawley Declaration -
Transcript of Australian Broadcasting System News
Segment, Dated January 6, 2015 ........................................ A-1247

Exhibit 23 to McCawley Declaration -
"After Vindication, Alan Dershowitz Vows to Sue
Sex Accuser in Court", by Ilan Shavit
(www.jewishbusinessnews.com, April 8, 2015) .................. A-1251

Declaration of Paul G. Cassell, for Plaintiff, in Opposition
to Proposed Intervenor Alan M. Dershowitz's Motion
to Intervene and Unseal, Dated August 29, 2016 ................ A-1255

Exhibit 1 to Cassell Declaration -
Excerpts of Deposition Transcript of Paul G. Cassell, in
*Edwards v. Dershowitz* (Circuit Court of the 17th Judicial
Circuit, Broward County, Florida Case No. 15-000072),
Dated October 16, 2015 ...................................................... A-1268

Exhibit 2 to Cassell Declaration -
Order of the Honorable Thomas M. Lynch, IV on Boies,
Schiller & Flexner LLP and Jane Doe No. 3's Motions to
Quash Subpoenas or for Protective Order, in *Edwards v.
Dershowitz* (Circuit Court of the 17th Judicial Circuit,
Broward County, Florida Case No. 15-000072),
Dated November 12, 2015
(Reproduced in confidential appendix at pp.
A-1136 to A-1138)

xiii

**Page**

Exhibit 3 to Cassell Declaration -
Order of the Honorable Thomas M. Lynch, IV Granting
Unopposed Motion for Order of Non-Waiver of Privilege,
in *Edwards v. Dershowitz* (Circuit Court of the 17th Judicial
Circuit, Broward County, Florida Case No. 15-000072),
Dated June 16, 2015 ............................................................ A-1328

Exhibit 4 to Cassell Declaration -
Notice of Withdrawal of Motion for Partial Summary
Judgment, in *Edwards v. Dershowitz* (Circuit Court of the
17th Judicial Circuit, Broward County, Florida Case No.
15-000072), Dated April 8, 2016 ........................................ A-1330

Reply Declaration of Proposed Intervenor Alan M. Dershowitz
in Further Support of his Motion to Intervene and Unseal,
Dated September 14, 2016 .................................................. A-1334

Sealed Opinion of the Honorable Robert W. Sweet,
Dated March 22, 2017 ........................................................ A-1361

A-1177 - A-1254

**THE DOCUMENTS REPRODUCED HEREIN WERE REDACTED IN THEIR ENTIRETY ON THE DISTRICT COURT DOCKET.**

**THEREFORE, THESE PAGES ARE OMITTED IN THIS REDACTED VOLUME FOR THE SAKE OF BREVITY BUT THE COMPLETE UNREDACTED VERSIONS CAN BE FOUND IN THE CORRESPONDING PAGES OF THE CONFIDENTIAL VOLUME.**

# United States District Court
## Southern District of New York

Virginia L. Giuffre,

        Plaintiff,               Case No.: 15-cv-07433-RWS

v.

Ghislaine Maxwell,

        Defendant.

_____/

### DECLARATION OF PAUL G. CASSELL IN SUPPORT OF PLAINTIFF'S OPPOSITION TO PROPOSED INTERVENOR ALAN M. DERSHWOITZ'S MOTION FOR PERMISSIVE INTERVENTION

      I, Paul G. Cassell, declare that the below is true and correct to the best of my knowledge as follows:

### BACKGROUND

      1.      I am a licensed attorney in the state of Utah.  I am authorized to practice before this Court pursuant to this Court's Order granting my Application to Appear Pro Hac Vice.

      2.      I respectfully submit this Declaration in opposition to Proposed Intervenor Alan M. Dershowitz's Motion for Permissive Intervention and Unseal of Judicial Documents, or in the Alternative Modification of the Protective Order.

      3.      I am the Ronald N. Boyce Presidential Professor of Criminal Law and University Distinguished Professor of Law at the S.J. Quinney College of Law, where I teach criminal procedure, criminal, and crime victims' rights.

1

## THE FLORIDA CRIME VICTIMS RIGHTS ACT CASE

4.      Since July 2008, I have been involved in important and precedent-setting crime victims' rights litigation in the Southern District of Florida trying to protect the rights of various victims under the Crime Victims' Rights Act (CVRA), 18 U.S.C. § 3771.  Along with Florida co-counsel Bradley J. Edwards, I have been pursuing a federal case pro bono on behalf of two young women who were sexually abused as underage girls by Dershowitz's close personal friend – Jeffrey Epstein.



6.      During the litigation, Mr. Edwards and I have won several important victories for our clients, including a ruling that the CVRA can apply to protect crime victims' rights even before an indictment is filed.  See Paul G. Cassell, Nathanael J. Mitchell & Bradley J. Edwards, *Crime Victims' Rights During Criminal Investigations?  Apply the Crime Victims' Rights Act Before Criminal Charges are Filed*, 104 J. CRIM. L. & CRIMINOLOGY 58, 67-69 (2014) (describing litigation concerning Epstein).

7.      ███████████████████████████████████

███████████████████████████████████████████████

---

[1] In this section of the Declaration, all references to docket entries will be to CVRA case in the Southern District of Florida, No. 9:08-cv-80736.

2

███████████████████████████.   Further efforts from the Government to avoid producing any discovery followed (see generally DE 225-1 at 4-5),[2] ultimately leading to a further Court ruling in June 2013 that the Government should produce documents.  DE 189.  The Government then produced about 1,500 pages of largely irrelevant materials to the victims (DE 225-1 at 5), while simultaneously submitting 14,825 pages of relevant materials under seal to the Court.   The Government claimed that these pages were "privileged" for various reasons, attaching an abbreviated privilege log.

8.      While these discovery issues were pending, in the summer of 2014, Mr. Edwards and I contacted Government counsel to request their agreement to add two additional victims to the case, including Ms. Virginia Giuffre (who was identified in court pleadings as "Jane Doe No. 3"). Edwards and I sought to have her added to the case via stipulation, which would have avoided the need to include any detailed facts about her abuse.   Weeks went by and the Government – as it had done on a similar request for a stipulation to add another victim – did not respond to counsel's request for a stipulation.

9.      Finally, on December 10, 2014, despite having had four months to provide a position, the Government responded by email to counsel that it was seeking more time, indicating that the Government understood that victims' counsel might need to file a motion with the court on the matter immediately.  DE 291 at 3-5.  Rather than file a motion immediately, victims' counsel waited and continued to press the Government for a stipulation.  See id. at 5. Finally, on December 23, 2014 – more than four months after the initial request for a stipulated joinder into the case – the Government tersely indicated its objection, without indicating any

---

[2] Jeffrey Epstein also attempted to block discovery of materials, leading to an Eleventh Circuit ruling that the victims' discovery efforts were proper.  Doe v. Epstein, 749 F.3d 999 (11th Cir. 2014).

3

reason: "Our position is that we oppose adding new petitioners at this stage of the litigation." See DE 291 at 5.

10.     Because the Government now contested the joinder motion, Edwards and I prepared a more detailed pleading explaining the justification for granting the motion. One week after receiving the Government's objection, on December 30, 2014, Ms. Giuffre (i.e., Jane Doe No. 3) and Jane Doe No. 4 filed a motion (and later a corrected motion) seeking to join the case. DE 279 and DE 280. Uncertain as to the basis for the Government's objection, the motion briefly proffered the circumstances that would qualify the two women as "victims" eligible to assert rights under the CVRA. See 18 U.S.C. 3771(e) (defining "crime victim" protected under the Act). ██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

11.     After the motion was filed, various news organizations published articles about it. Dershowitz also made numerous media statements about the filing, including calling Jane Doe No. 3 "a serial liar" who "has lied through her teeth about many world leaders." http://www.cnn.com/2015/01/06/us/dershowitz-sex-allegation/.     Dershowitz also repeatedly called Edwards and me "two sleazy, unprofessional, disbarable lawyers." Id. He made many similar remarks of an equivalent character, and also stated in media appearance that if we had

4

**A-1259**

done one hour of work investigating Ms. Giuffre's allegations of sexual abuse against him, we would have immediately seen that those allegations were false.

12.     On January 5, 2015, Dershowitz filed a motion to intervene to argue to have the allegations stricken.  DE 282.  Dershowitz also argued that Ms. Giuffre had not provided a sworn affidavit attesting to the truth of her allegations.

13.     On January 21, 2015, Edwards and I filed a response for our clients, Ms. Giuffre and Jane Doe No. 4.  DE 291. ██████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████

14.     On February 6, 2015, Edwards and Cassell filed a further pleading (and affidavit from Ms. Giuffre, see DE 291-1) in support of her motion to intervene.

15.     On April 7, 2015, Judge Marra denied Ms. Giuffre's motion to join the case. Judge Marra concluded that "at this juncture in the proceedings" details about the sexual abuse she had suffered was unnecessary to making a determination "of whether Jane Doe 3 and Jane Doe 4 should be permitted to join [the other victims'] claim that the Government violated their rights under the CVRA.  The factual details regarding with whom and where the Jane Does engaged in sexual activities are impertinent to this central claim (i.e., that they were known victims of Mr. Epstein and the Government owed them CVRA duties), especially considering

5

that the details involve non-parties who are not related to the respondent Government." DE 324 at 5 (emphasis in original). While Judge Marra struck those allegations, he emphasized that "Jane Doe 3 is free to reassert these factual details through proper evidentiary proof, should [the victims] demonstrate a good faith basis for believing that such details are pertinent to a matter presented for the Court's consideration. Judge Marra then denied Ms. Giuffre's motion to join the case, but allowed her to participate as trial witness: "The necessary 'participation' of [Ms. Giuffre] . . . in this case can be satisfied by offering . . . properly supported – and relevant, admissible, and non-cumulative – testimony as needed, whether through testimony at trial . . . or affidavits supported in support [of] the relevancy of discovery requests." DE 324 at 8 (emphasis deleted).

16.     In a later supplemental order, Judge Marra stated that the victims "may re-refile these documents omitting the stricken portions." DE 325. The victims have since refiled these documents.

17.     The CVRA case continues to be litigated, and the victims filed a comprehensive motion for summary judgment earlier this year. See DE 361 (filed Feb. 10, 2016; government response not yet filed).

### THE FLORIDA DEFAMATION CASE



A-1261

19.     Rather than try these questions in the media, Mr. Edwards and I filed a defamation action in Florida against Dershowitz.  We were represented by well-known Florida attorney Jack Scarola.

Case 1:15-cv-07433-RWS   Document 408   Filed 08/29/16   Page 8 of 13



Sealed Exhibit 1, Depo. of Paul Cassell (Oct. 16 & 17, 2015), at 61-117.

22.     Ms. Giuffre was not a party to the litigation between Dershowitz, Mr. Edwards, and me.

23.     During the course of the litigation, however, Dershowitz sought to obtain discovery from Ms. Giuffre.  In particular, Dershowitz sought to obtain from Ms. Giuffre (a non-party to the action) all of her emails with the media.  The Court denied his discovery request. Attached hereto as Sealed Exhibit 2 is a true and correct copy of the court's order denying that discovery.

24.     Dershowitz produced many documents in the course of discovery in that case – and, ironically, he placed many document under a protective order in Florida.  Attached hereto as

Sealed Exhibit 3 is a true and correct copy of the court's protective order, which Dershowitz used to keep documents under seal.

26.     Ultimately, Dershowitz settled the defamation case.  That settlement included both a public statement and confidential monetary payments.  As part of the settlement, Edwards and I withdrew our allegations against Dershowitz in the defamation case contained in the then-pending summary judgment motion and Dershowitz withdrew his allegations of unethical conduct, as reflected in the Notice of Withdrawal of Motion for Partial Summary Judgment attached hereto as Sealed Exhibit 4.

27.     As Mr. Edwards and I explained in the notice of withdrawal of this motion, "the withdrawal of the referenced filings is not intended to be, and should not be construed as being, an acknowledgement by Edwards and Cassell that the allegation made by Ms. Giuffre were mistaken.  Edwards and Cassell do acknowledge that the public filing in the Crime Victims' Rights Act case of their client's allegation against Defendant Dershowitz became a major distraction from the merits of the well-founded Crime Victims' Rights Act by causing delay and, as a consequence, turned out to be a tactical mistake."  Id.

28.     Contrary to representations made by Dershowitz in his brief (DEC ¶24 at pg. 5), in settling our personal defamation case against Dershowitz, Edwards and I have never reached any conclusion that Ms. Giuffre – our client -- was mistaken in her allegations that Dershowitz sexually abused her.

I declare under penalty of perjury that the foregoing is true and correct.


/s/ Paul G. Cassell _____
Paul G. Cassell, Esq.


Dated: August 29, 2016.

Respectfully Submitted,

BOIES, SCHILLER & FLEXNER LLP

By: /s/ Meredith Schultz _____
Sigrid McCawley (Pro Hac Vice)
Meredith Schultz (Pro Hac Vice)
Boies Schiller & Flexner LLP
401 E. Las Olas Blvd., Suite 1200
Ft. Lauderdale, FL 33301
(954) 356-0011

Bradley J. Edwards (Pro Hac Vice)
FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Avenue, Suite 2
Fort Lauderdale, Florida 33301
 (954) 524-2820

Paul G. Cassell (Pro Hac Vice)
S.J. Quinney College of Law
University of Utah
383 University St.
Salt Lake City, UT 84112
(801) 585-5202[3]

---

[3] This daytime business address is provided for identification and correspondence purposes only and is not intended to imply institutional endorsement by the University of Utah for this private representation.

A-1267

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on August 29, 2016, I electronically filed the foregoing

document with the Clerk of Court by using the CM/ECF system. I also certify that the foregoing

document is being served to all parties of record via transmission of the Electronic Court Filing

System generated by CM/ECF.

      Laura A. Menninger, Esq.
      Jeffrey Pagliuca, Esq.
      HADDON, MORGAN & FOREMAN, P.C.
      150 East 10th Avenue
      Denver, Colorado 80203
      Tel: (303) 831-7364
      Fax: (303) 832-2628
      Email: lmenninger@hmflaw.com
            jpagliuca@hmflaw.com

                /s/ Meredith Schultz
                  Meredith Schultz

13

A-1268 - A-1333

**THE DOCUMENTS REPRODUCED HEREIN WERE REDACTED IN THEIR ENTIRETY ON THE DISTRICT COURT DOCKET.**

**THEREFORE, THESE PAGES ARE OMITTED IN THIS REDACTED VOLUME FOR THE SAKE OF BREVITY BUT THE COMPLETE UNREDACTED VERSIONS CAN BE FOUND IN THE CORRESPONDING PAGES OF THE CONFIDENTIAL VOLUME.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

VIRGINIA GIUFFRE,

                Plaintiff,

   -against-

GHISLAINE MAXWELL,

                Defendant.

Index No. 15 Civ. 7433 (RWS)

**REPLY DECLARATION OF
ALAN M. DERSHOWITZ IN
FURTHER SUPPORT OF
MOTION TO INTERVENE
AND UNSEAL**

       **ALAN M. DERSHOWITZ** declares under penalty of perjury that the following

is true and correct:

       1.        I am personally familiar with the facts set forth in this Reply Declaration,

which I submit in further support of my pending motion to intervene and to unseal the

"Requested Documents," as that term is defined in Paragraph 3 of my August 11, 2016

Declaration.

**Introduction and Overview**

       2.        Rather than offering a valid and proper basis for opposing my motion, the

papers submitted on behalf of plaintiff Virginia Roberts Giuffre—particularly, the lengthy

declaration of Paul Cassell, one of Ms. Giuffre's lawyers and a former federal judge—are little

more than an effort to revive and further the false and scurrilous allegations of sexual misconduct

that compelled me to seek the Court's assistance in the first place.  As his declaration makes

clear, Mr. Cassell has crossed the line from being a legitimate advocate for a client, to being a

lawyer who is seeking to justify his *own* conduct in the face of compelling evidence that his

client is a thoroughgoing liar.  That was, after all, the gravamen of Mr. Cassell's defamation case

against me: the assertion, now repeated at length before this Court, that Ms. Giuffre's lawyers

A-1335

had a valid basis for disseminating her false, grotesque and impertinent allegations against me in a public filing.  And it is that "fight," essentially, that Mr. Cassell reignites in his declaration in this matter.  To be clear, this not a fight that that I started and it is certainly not one that I am asking this Court to referee or resolve in any way.  I am only asking that the Court refuse to allow its Protective Order, which was entered based upon a stipulation that explicitly contemplated that the Order might be modified, from being used to prevent me from disclosing documents that reveal the truth.  Having now, again, been subjected to an unfair and unwarranted false attack on my credibility and reputation for personal rectitude, I have no choice but to respond on the merits.

3.          I begin by, again, swearing under oath that I did not sexually abuse Virginia Roberts Giuffre, and that any allegation or suggestion to the contrary is categorically false.  I never had sexual contact with Ms. Giuffre of any kind, and, to my knowledge, I never even met her until her deposition in 2016.   By swearing to this, I am deliberately exposing myself to a perjury prosecution and disbarment if I am not telling the truth.  If Ms. Giuffre were to submit an affidavit repeating her false allegations against me, I would welcome and cooperate with a criminal investigation by any prosecutorial office as to whether it is Ms. Giuffre or I who is committing perjury.   It is inescapably clear that one of us is lying under oath.  I know it is not me.

4.          Against this backdrop, and the facts set forth in my August 11, 2016 Declaration, Mr. Cassell, on his client's behalf, has put into the record a declaration replete with factual inaccuracies, omissions, and flat-out misrepresentations.  Among other things, he misstates important elements of both the Crime Victims' Rights Act lawsuit filed by Ms. Giuffre, and others, in Florida (the "CVRA Action"), and the defamation lawsuit that he and his

colleague, Bradley Edwards, brought against me (*Edwards v. Dershowitz*, Case No. CACE

15-000072 (Cir. Ct., Broward Cnty., Fla.)). Moreover, he elides or mischaracterizes testimony

gathered in those and other proceedings in order to make them appear inculpatory of me when, in

fact, they are just the opposite.

      5.        In doing so, Mr. Cassell seeks to accomplish two goals simultaneously:

*first*, to suppress information—the Requested Documents—which exculpates me from the

charges of sexual misconduct, while allowing Ms. Giuffre and her allies to publicly disseminate

those selected "facts" that, they believe, support her allegations against me; and, *second*, to prove

that Mr. Cassell—and , by extension, his colleague Mr. Edwards and Ms. Giuffre's current

lawyers at Boies Schiller & Flexner, LLP—have a valid factual basis for continuing to press Ms.

Giuffre's false allegations.  Mr. Cassell's effort is an unmitigated failure, as this declaration

demonstrates.

      6.        While much of the Cassell Declaration goes far beyond what is reasonably

required to respond to the instant motion, and while it surely has the distinct air of "protesting

too much," I cannot stand mute in the face of this continuing assault on my character.   As this

declaration and the accompanying reply brief will demonstrate, the charges against me are

baseless, and unsealing the Requested Document is the only proper response to Ms. Giuffre's

efforts to smear me through the legal process.

      7.        In its effort to block the unsealing of the Requested Documents and to

justify Ms. Giuffre's lawyers' decision to represent her, the Cassell Declaration cites five

sources: ███████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

3

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████ I will address each of these,

in detail, in turn. As will immediately become clear, the information presented by Mr. Cassell in

no way substantiates Ms. Giuffre's claims.  To the contrary, much of the evidence contradicts

Ms. Giuffre's version of events.  In addition, I offer a few final points about matters that

demonstrate clearly that Ms. Giuffre is not a credible witness.

████████████████████████

      8.        The Cassell Declaration cites ███████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███ as Mr. Cassell conceded in his deposition in the *Edwards* defamation case, my name does

*not even appear* in the Palm Beach Police Department Report—much less does the Report

contain an allegation that I sexually abused someone.  *See* Ex. O at 31 (Deposition Transcript of

Paul G. Cassell, October 16-17, 2015).

      9.       ██████████████████████████████

██████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████ First, I was

not present in that home—or on Mr. Epstein's private island, or at his New Mexico ranch, or on

4

his airplane—during the time Ms. Giuffre was associated with him.   Dershowitz Decl.,[1] ¶ 9.

Nothing about Ms. Giuffre's relationship with Mr. Epstein, or her age, could have been

"obvious" to me, because I never met her.   Second, there is simply no evidence that Mr.

Epstein's alleged abuse of minor victims at his home in Palm Beach was "obvious" or known to

any  "visiting guests," given that the abuse took is alleged to have taken place in a separate part

of the house, namely Mr. Epstein's private bedroom.

      10.          Ms. Giuffre and her counsel have alleged that she was not the only "young

girl" that I had sexual contact with – *i.e.*, that there were others.  Of course, no such persons have

ever presented themselves to corroborate this accusation.  Nonetheless, Mr. Cassell latched on to

this allegation as a "basis" for his filing in the CRVA Action, which named me as a serial abuser.

      11.          Demonstrating how little Mr. Cassell really had to go on in this regard, I

ask the Court to consider Mr. Cassell's response to a question put to him in deposition

concerning who, other than his client, he had reason to believe was abused by me.  All Mr.

Cassell could muster was this:

> [CASSELL]: …I have 24 names in mind as possible sexual abuse
> victims that *Dershowitz may or may not have abused.* And I have
> not been able to pinpoint exactly what happened, because the
> people who would be in the best position to help me sort out what
> the names were [--] specifically Jeffrey Epstein, among others [--]
> have refused to cooperate and give me those names" (emphasis
> added).

Ex. O at 36-37.

      12.          The very idea that Mr. Cassell could claim that, without more, a mere *list*

of alleged victims that he believes that I "*may or may not have abused*" would provide a basis for

publicly accusing me of heinous crimes, well illustrates Mr. Cassell's mindset.

---

[1] Citations to "Dershowitz Decl." refer to my August 11, 2016 moving declaration.  Exhibits O through X are
attached to this Reply Declaration.

13.        As the record demonstrates, I could not have abused Virginia Roberts

Giuffre because, as the records establish, I was never in Mr. Epstein's Palm Beach home, private

island, ranch or airplane during the two years that she was associated with Mr. Epstein. ████

████████████████████████ neither corroborates Ms. Giuffre's false accusation, nor

supports the decision by Mr. Cassell, Mr. Edwards and the other lawyers for Ms. Giuffre to

publicly accuse me of such pedophila.

████████████

14. ████████        In his Declaration, Mr. Cassell suggests that ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ This allegation, and

the string of inferences necessary to make it "work," is patently absurd. ████████████

████████████████████████████████████████████████

████████████████████████████████████████

███████████████████████

15.        In his deposition in the defamation case against me, Mr. Cassell

acknowledged that my name did not appear in the aircraft flight logs during the time period in

which Ms. Giuffre was associated with Mr. Epstein:

> [CASSELL]: The face of the flight logs for the relevant period of
> time, we can call it the hot period of time or whatever you want,
> did not reveal the presence of Mr. Dershowitz on those flights, yes.
>
> Q: Okay. So during the period—well, actually, there's no flight log
> that shows Virginia Roberts and Professor Dershowitz on the same
> airplane, correct?
>
> A: That's my understanding, yes.

Ex. O at 205.

6

**A-1340**

16.        Desperate to draw some connection between me and young girls on the airplane, Mr. Cassell also states that



17.

       During my deposition in the *Edwards* case, I was asked about and shown photos of "Tatiana"; I said that I thought she appeared to "about 25" years old. It turned out that my estimate was correct. This exchange followed:

> [DERSHOWITZ]: … I must say that during the recess, my wife Googled Tatiana and found out that she was, in fact, 24 years old in 1995 [sic - 2005][2], at the time she flew on that airplane. So that my characterization of her as about 25 years old is absolutely correct. And the implication that you sought to draw by showing me those pictures was not only demonstrably false, but you could have easily discovered that the implication you were drawing was demonstrably false by simply taking one second and Googling her name as my wife did."

Ex. P at 216-17 (Deposition Transcript of Alan M. Dershowitz, October 16, 2015).

---

[2] In fact, I meant the year 2005. According to Wikipedia, Ms. Kovylina was born on November 4, 1981. *See* https://en.wikipedia.org/wiki/Tatiana_Kovylina.

18.        Mr. Cassell was present at my October 2015 deposition in the *Edwards*

case, and he is aware of Tatiana Kovylina's actual age.  Yet, ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████    That is simply

false.

████████████████████████████████████████████████

19.        ████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

█████████████████████████    The Josefsberg-filed civil complaint did not name me.

20.        Mr. Cassell was not relieved of his professional obligation to investigate

the *bona fides* of Ms. Giuffre's claims simply because ████████████████████████████

██████████████████████████████████████████████████

████████████████████████████    the Josefberg-drafted case does *not* name me as an abuser.

Moreover, Mr. Josefsberg has continued to maintain a personal and professional relationship

with me, something he would not have done if he believed I had abused his client—a fact that

Mr. Cassell and the other lawyers could have readily ascertained.

21.        Nor was it reasonable to accuse me of pedophila based on ████████████████

████████████████████████████████████████████████████████████████████

███████████████████████   As Mr. Cassell is well aware, Jeffrey Epstein was heavily

involved in funding academic research at Harvard and kept an office there,[3] and he was

consequently friendly with many academics, including David Gergen, Marvin Minsky, Larry

Summers, Stephen Kosslyn, Henry Rosovsky, Howard Gardner, and Stephen Jay Gould, among

others. ████████████████████████████████████████████

███████████████████████████████████████   According to workers at Mr. Epstein's

Palm Beach mansion, he received visits from "friends from Harvard" and other "very important

people."  Ex. U at 28 (Deposition Transcripts of Alfredo Rodriguez, July 29, 2009 and August 7,

2009).  All of the "evidence" that Ms. Giuffre and her lawyers claim implicates *me* is equally

applicable to dozens of *other* academics and public figures who were associated with Mr.

Epstein—including Larry Summers, Stephen Hawking, Henry Rosovsky, Nathan Myhrvold,

Steven Pinker, Martin Nowak, Daniel C. Dennett, David Gergen, George Church, Richard

Dawkins, Gerard 't Hooft, David Gross, Frank Wilzek, Howard Gardner, Stephen Jay Gould,

and many others.

    22. ██████████  Of course, Ms. Giuffre's credibility on these matters is nil.  To cite one

example, Harvard Professor ██████████ is one of the "academicians" Ms. Giuffre has

accused.  In the ████████ that I am trying to unseal, ████████████████████

██████████████████████

                ████████████████████████████████████

---

[3] My relationship with Jeffrey Epstein, prior to when he was accused and I became one of his lawyers, was
academic and intellectual in nature.  Along with many prominent academics, I attended seminars and other events,
mostly at his office in Cambridge.  I did send him my manuscripts to review and I acknowledged his intellectual
input in the acknowledgments to several of my books.  Many other academics were acquaintances of Mr. Epstein.
They interacted with him on a somewhat regular basis, including during the time period in which he was allegedly
abusing Ms. Giuffre, and yet, to my knowledge, they had no idea that he may have engaged in sex acts with minors,
because he kept his private life completely separate from his academic life.  I have never see Mr. Epstein with an
underage girl.



Dershowitz Decl., Ex. B at GIUFFRE004192-93.



Dershowitz Decl., Ex. G at 27.

23. ████████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████

24. ██████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████

25. ██████████   Ms. Giuffre has also claimed to have had sex with such prominent
individuals as former ████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

26.     To summarize: before choosing to file the Motion for Joinder in the CVRA lawsuit that publicly accused me of pedophilia, Mr. Cassell and Mr. Edwards were aware, or should have been aware, of ▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Moreover, they were aware, or should have been aware, of glaring problems in Ms. Giuffre's credibility.  Yet, Ms. Giuffre's lawyers decided to treat her as a credible witness, and to accuse me of a heinous crime on the basis of her inconsistent and incoherent testimony alone. ▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬ I believe that I was accused by her because my name— along with that of Prince Andrew—was certain to garner international publicity. ▬▬▬▬▬▬▬▬▬▬

27. ▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬

---
[4]   ▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬ ▬▬ ▬▬▬▬▬

28.　　　　　In the first place, even a second-year law student knows that adverse

inferences can only be drawn against a party who either invokes the Fifth Amendment in a civil

case him or herself, or controls the witness who does so (as in an employer-employee

relationship).   *See LiButti v. United States*, 107 F.3d 110, 123-24 (2d Cir. 1997).   Obviously, I

have *never* refused to answer questions about Ms. Giuffre's absurd and false allegations against

me—I have repeatedly denied them outright, under oath—and I exercise no control over any of

Mr. Epstein's associates who invoked their Fifth Amendment privilege.

29.　　　　　　　　　　　　　　　　　　　　　　　　　

　　　　　　　　　　　fact is, the three women—Sarah Kellen, Adriana Mucinska, and

Nadia Marcinkova—all asserted their Fifth Amendment privileges when answering *every single*

*question* posed to them in their depositions, not solely in response to questions about me.   For

example, here is this exchange from the deposition of Ms. Kellen:

> Q: Did you ever meet Bill Clinton?
>
> . . . .
>
> A [Kellen]: On the instruction of my lawyer, I must invoke my
> Fifth Amendment right.
>
> Q: Did you ever fly with these three gentlemen and Jeffrey Epstein
> to Africa on Jeffrey Epstein's 727 airplane?
>
> . . . .
>
> A: At the instruction of my lawyer, I must invoke my Fifth
> Amendment right.

13

Ex. R at 39-40 (Deposition Transcript of Sarah Kellen, March 24, 2010).

30. ██████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████

31. ████████  As Mr. Cassell well knows, witnesses risk waving their Fifth Amendment privilege by invoking it only selectively.  This is why defense attorneys generally advise their clients to claim the Fifth as to all questions. ████████████████████████

████████████████████████████████████████████████

████████  Had these individuals been asked if they knew whether I had assassinated John F. Kennedy, they would have taken the Fifth. ████████████████████████

███████████████████████████████████

32.          In truth, I sincerely wish that Mr. Epstein's associates had *not* invoked the Fifth Amendment with regard questions about me.   Had they testified fully and truthfully, I would have been shown to have done nothing wrong.

████████████████████████████████████████

33. ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[5]  Likewise, Ms. Kellen, Ms. Mucinska, and Ms. Marcinkova asserted their Fifth Amendment privilege when questioned about a number of celebrities, including David Copperfield, Kevin Spacey, and Les Wexner, among others.  One of the prosecuting attorneys, frustrated by this tactic observed:

> I think it's absolutely absurd that she's objecting to some for these questions or taking the Fifth to some of these questions. I mean, I want to Sid [sic] to ask her now if the sky is blue. I think she's going to take the Fifth to that question, as well.

Ex. R at 12.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████ This effort fails

under even cursory scrutiny.

34. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

35. ████████████████████████████████████████████████

████████████████████

      ████████████████████████████████████████████████

      ████████████████████████████

      ████████████████████████████████████

      ██████████████

      ████████████████████████

      ██████████████████████████

██████████████████████

36. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

37.        In fact, Mr. Alessi has since provided an affidavit flatly *denying* that he

saw both Ms. Giuffre and I at the Palm Beach mansion at the same time.

> "I was never asked by any attorneys if Virginia Roberts came to
> the house when Mr. Dershowitz was there.   If I had been asked, I
> would have answered that I never saw Virginia Roberts at the
> house when Mr. Dershowitz was there."

Ex. Q at ¶ 19 (Affidavit of Juan P. Alessi, January 13, 2016).  Indeed, in his affidavit, Mr. Alessi

goes on to say, "I never saw Mr. Dershowitz do anything improper or be present while anyone

else was being improper."  *Id.*

38.        Juan Alessi's affidavit also confirms that Mr. Cassell and Edwards failed

to interview him as part of their supposed "investigation" into Ms. Giuffre's claims, and

consequently grossly misrepresented the statements he made in his deposition:

> The following statement made by Virginia Roberts's attorneys and
> their own attorney in a filing on December 4, 2015 is not accurate
> and is a misrepresentation of what I said in my deposition: "Alessi
> was able to identify a photograph of Ms. Giuffre as someone who
> was at the mansion as [sic] the same time as Dershowitz.
>
> As far as I can recall, since I gave my deposition in 2009, I have
> never been asked by Brad Edwards or Paul Cassell about my
> knowledge regarding Virginia Roberts or Alan Dershowitz or
> about my 2009 deposition testimony.

*Id.* at ¶¶ 20-21.

39.        ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████   in an affidavit, Mr. Alessi states that:

> The following statement made by Virginia Roberts's attorneys in a filing on January 21, 2015 is not accurate and is a misrepresentation of what I said in my deposition: "the private, upstairs room where Dershowitz got his 'massages' was one that contained a lot of vibrators—Maxwell had a 'laundry basket… full of those toys' in that room.'"
>
> . . . .
>
> I did not state or imply that vibrators or sex toys were found after massages in other rooms used by guests because that was not the case.   Guests having massages did not have massages in Mr. Epstein's private bedroom suite.   This area was private and off-limits to guests, which I explained to the lawyers during my deposition.

*Id.* at ¶¶ 9-10.

40.      Juan Alessi undermines numerous other elements of Ms. Giuffre's account as well.  For example, Mr. Alessi did not see "any photographs of Virginia Roberts in Mr. Epstein's house"—partially naked or otherwise.  *Id.* at ¶ 17.  And, contrary to Ms. Giuffre's description, massages were not simply a code word for sexual encounters.  Many guests at the Epstein mansion received massages from professional masseuses—and all of whom were, as Mr. Alessi testified, "overage" to "maybe mid-forties."  *Id.* at ¶ 8.  Indeed, despite working for Jeffrey Epstein for many years, Mr. Alessi was "unaware of any masseuses being under the age of 18."  *Id.* ███████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████

41.      To be clear, the only massage I recall receiving at the Epstein home was conducted by a professional masseuse—a woman in her in her 30s or 40s.  This occurred well outside the timeframe when Ms. Giuffre was associated with Mr. Epstein and I acknowledged this in numerous interviews shortly after Ms. Giuffre accused me.[6]  In addition, there were never

---

[6] *See*, for example: Bob Norman, "Alan Dershowitz: 'Sex Slave' Accuser is Serial Liar, Prostitute," Local 10 News, 22 January 2015, *available at* http://www.local10.com/news/alan-dershowitz-sex-slave-accuser-is-serial-liar-

any sex toys in any room I ever stayed in, nor were there any visible pictures of naked young women.  My children and grandchildren stayed in the rooms in question at Mr. Epstein's home during Christmas of 2005.  I would never have allowed my family to stay in a home with such items, nor would I have stayed in such a home.

42.

But Mr. Rodriguez was clear that he did not know whether I received a massage, and did not know if I was aware that there were young girls present in the house:

> "Q: Okay. When Alan Dershowitz was at the house I understood you to say that these local Palm Beach girls would come over to the house while he was there but you're not sure if he had a massage from any of those girls.
>
> A: Exactly.
>
> Q: And what would he do while those girls were at the house?
>
> . . . .
>
> A: He will read a book with a glass of wine by the pool, stay inside.
>
> Q: Did he ever talk to any of the girls?
>
> A: I don't know, sir.
>
> Q: Certainly he knew that they were there?
>
> . . . .

---

prostitute.  I never denied having one professional massage.  I did truthfully state that it was a lie to claim that I had sexual massages in a room full of sex toys.

[7] Ms. Kellen was in her late 20s and to my knowledge, was a legitimate employee of Mr. Epstein.  Ms. Marcinkova was, to my knowledge, an adult friend of Mr. Epstein.

**A-1352**

       A: I don't know sir."

Ex. U at 426-27.

    43.      Mr. Rodriguez's testimony contained nothing inculpatory of me and, inasmuch as it concerned the period 2005 and later, it has absolutely no bearing on Ms. Giuffre's allegations about me, since Ms. Giuffre left Mr. Epstein's orbit in 2002.

    44.  [REDACTED]

    Q: Donald Trump was a friend of Jeffrey Epstein; is that not correct?

    A: I really don't -- my understanding is yes, but I -- I don't have a lot of information about Trump.

    Q: It's true also, is it not, that Mr. Trump was a frequent visitor to Mr. Epstein's residence?

    A: I -- I know that he visited frequent. I -- I don't have a lot of information about Trump.

    Q: And his name is circled in this book; is it not?

---

[8] Including Peter Soros, Joseph and Florina Rueda, Alberto Pinto, Valda Veira Cotrin, Evan Anderson, Michelle Campos, Eric Gany, Cindy Lopez, Timothy Newcombe, Douglas Schoettle, Caroline Stark, Larry Visoski, Tom and Pat Sawyers, Lynn Fontanella, Christophe Gaie, Bill Maronet, Mike Pazulo, Alan Stopek, and Bruce King.

A: I believe it is.

Q: Based on him -- assuming he's a frequent visitor to Mr. Epstein's home, and that he's a friend of Mr. Epstein's, and that his name is circled in this book, do you infer that he was engaged in criminal sexual abuse of minors?

A: No.

Ex. O at 233.



Again, these assertions are false or misleading, and absurd in equal measure.

45.

46.     During my representation of Jeffrey Epstein, I was a member of an extensive legal team, which collectively decided how Epstein should interact with law enforcement during their investigation.  Together with other members of the legal team, I, among others, communicated with the Palm Beach State Attorney's Office—including scheduling meetings to depose Epstein—at the behest of the client. This behavior does not constitute a ▮▮▮▮▮▮▮▮▮▮▮▮ instead, it reflects a legal strategy, devised by a team of defense lawyers aiming to secure the best possible result for their client.

20

47.

48.        Although a legal assistant for Bradley Edwards, one of Ms. Giuffre's lawyers, once claimed that I was served with a subpoena in 2009, this was not true; I was never served with a subpoena, and contemporaneous documentary evidence proves as much.

49.        In August 2011, another attorney representing Ms. Giuffre, Jack Scarola, called me to ask that I provide information on Mr. Epstein's alleged abuse of minors, and particularly young women.  I responded on August 15th, in writing that, if Mr. Scarola were to provide me with a more detailed request, I would try to provide any relevant non-privileged information.  *See* Ex. S at SCAROLFA 016566 (Scarola Correspondence, August-September 2011).  Mr. Scarola wrote back to me on August 23rd, stating that "We . . . have reason to believe that you have personally observed Jeffrey Epstein in the presence of underage females, and we would like the opportunity to question you under oath about those observations."  *Id* at SCAROLA 016567.  I replied that "If you in fact have such testimony it is perjurious. I have never seen Epstein in the presence of an underage female."  *Id.* at SCAROLA 016570.

50.        Despite this unambiguous answer, Mr. Edwards and Mr. Scarola attempted to subpoena me in 2013.  This time, they left a subpoena with an assistant to another faculty member at Harvard Law School—an improper form of service.   I again made it clear to them that I had no relevant non-privileged information to provide, and that I had been instructed by my client not to volunteer any information.  There was no follow up by Mr. Scarola and no attempt to serve me properly.

A-1355

51.          At no point did Mr. Edwards, Mr. Scarola, or any of their associates tell me that Ms. Giuffre had accused me of sexual abuse, because, at that point, she had not. Had I been accused at that time, I would have provided records demonstrating the falsity of any such allegations.

*Other Facts That Show that Ms. Giuffre Lacks Credibility*

52.          Inasmuch as Mr. Cassell is inviting this Court to accept Virginia Roberts Giuffre's assertions about me, other examples of her lack of credibility are relevant.

53.          In the first place, Ms. Giuffre has been demonstrated to have made up wildly implausible tales for financial gain.   In 2011, for example, Ms. Giuffre was interviewed by Sharon Churcher at *The Daily Mail*, and provided detailed accounts of an alleged encounter with Bill Clinton on Jeffrey Epstein's private island in the Caribbean.   In exchange for that interview, Ms. Giuffre was paid $160,000. Ms. Giuffre's account of meeting Clinton is both completely unbelievable on its face, and demonstrably untrue.  For example, she claims that: "Ghislaine Maxwell went to pick up Bill [Clinton] in a huge black helicopter that Jeffrey had bought her. She'd always wanted to fly and Jeffrey paid for her to take lessons, and I remember she was very excited because she got her license around the first year we met.  I used to get frightened flying with her but Bill had the Secret Service with him and I remember him talking about what a good job she did."  Ex. T at 2-3 (Daily Mail Article, March 5, 2011).  Ms. Giuffre then described, in detail, a dinner with President Clinton, Jeffrey Epstein and others on Little St. James Island, which Mr. Epstein owned.[9]

_____
[9] Further demonstrating her ability to weave a vivid, yet utterly false tale, Ms. Giuffre also recounts that: "We all dined together that night.  Jeffrey was at the head of the table.  Bill was at his left.  I sat across from him.  Emmy Tayler, Ghislaine's blonde British assistant sat at my right.  Ghislaine was at Bill's left and at the left of Ghislaine there were two olive-skinned brunettes who'd flown in with us from New York…. Maybe Jeffrey thought they would entertain Bill, but I saw no evidence that he was interested in them.  He and Jeffrey and Ghislaine seemed to have a very good relationship.  Bill was very funny." Ex. T at 3-4.

54.         Ms. Giuffre' entire account is fabricated out of whole cloth:  President

Clinton was never on the island during the relevant period.  A FOIA request submitted by

former FBI Director Louis Freeh for "all shift logs, travel records, itineraries, reports, and other

records for USSS personnel travelling with former President Bill Clinton to Little St. James

Island and the US Virgin Islands" revealed that "Bill Clinton did not in fact travel to, nor was he

present on, Little St. James Island between January 1, 2001, and January 1, 2003."  *See*

Dershowitz Decl., Ex. I.  Moreover, the notion that the Secret Service would allow a former

president to be flown by an amateur pilot is ridiculous on its face.

55.         In that same Daily Mail article, Ms. Giuffre claimed "that Mr. Clinton's

vice-president Al Gore and his wife, Tipper, were also guests of Epstein on his island" on a

different occasion.  Ex. T at 4.  Ms. Giuffre purported to provide specific details of this

encounter: "I had no clue that anything was up. The Gores seemed like a beautiful couple when

I met them. All I knew was that Mr. Gore was a friend of Jeffrey's and Ghislaine's. Jeffrey

didn't ask me to give him a massage. There might have been a couple of other girls there on that

trip but I could never have imagined this guy would do anything wrong.  I was planning to vote

for him when I turned 18.  I thought he was awesome." *Id.* at p. 5.

56.         This story too was made up – a fiction peddled for money.  By all

available accounts, Mr. Gore and his wife *never set foot* on Mr. Epstein's private island, nor

even met Mr. Epstein.  Ms. Giuffre' lawyers, who included David Boies, could easily have

ascertained as much.  Vice President Gore had been Mr. Boies's client and Mr. Boies could

have simply asked him whether he had ever visited Mr. Epstein's island in the Caribbean.  Had

he done so, Mr. Boies would have learned that Ms. Giuffre's account was false.

57.     Critically, Ms. Giuffre also lied about her age—specifically, the age she was during the time period in which she was associated with Jeffrey Epstein.  Contrary to previous statements that she was fifteen when she was trafficked by Mr. Epstein, Ms. Giuffre could not have even have met him until 2000, the year she turned seventeen.  There is documentary evidence, recently discovered and undisputed, that Ms. Giuffre' father—who arranged her employment at The Mar-A-Lago Club in Palm Beach—did not begin working there until April 11, 2000.  Ms. Giuffre has repeatedly stated that she first met Ghislaine Maxwell at the Mar-A-Lago where she had a summer job as a changing room assistant—indeed it is one of the few aspects of her story that has remained consistent from the outset.[10]  Ms. Giuffre turned seventeen in the summer of 2000.  By the time Mr. Epstein is alleged to have begun trafficking her to his acquaintances—six to nine months *after* their first encounter,[11] or in at least one telling *two years* later,[12] Ms. Giuffre may have been over eighteen.

58.     The issue of Ms. Giuffre's age at the time of certain events is important as a legal matter—and her lack of credibility about it is telling.  The age of consent in New York is seventeen.  As to the other locations with varying ages of consent—in Florida it is eighteen— it is impossible to know whether Ms. Giuffre is claiming to have been a minor because she has never specified—presumably even to her own lawyers—*when* the alleged acts were supposed to have occurred.  She has not even provided *the year* in which she claims specific events occurred. So it cannot be presumed—by her lawyers or by anyone else—that she was a minor when she

---

[10] *See* for example, Zachary Davies Boren, *Virginia Roberts: Who is the woman at the centre of the Prince Andrew sex allegations?*, The Independent (Jan. 5, 2015), *available at* http://www.independent.co.uk/news/uk/home-news/virginia-roberts-what-do-we-know-about-the-woman-at-the-centre-of-the-prince-andrew-sex-allegations-9958539.html.

[11] *See* for example, Ex. V at 10 (Telephone Interview with Virginia Roberts, April 7, 2011).

[12] *See* Sharon Churcher, *Prince Andrew and the 17-year-old Girl His Sex Offender Friend Flew to Britain to Meet Him*, DailyMail.com (Mar. 2, 2011) ("'After about two years, he started to ask me to 'entertain' his friends.'"). *Available at* http://www.dailymail.co.uk/news/article-1361039/Prince-Andrew-girl-17-sex-offender-friend-flew-Britain-meet-him.html?ito=feeds-newsxml.

claims that Mr. Epstein trafficked her.  It is much more likely, in light of when she actually met

Jeffrey Epstein and when she says she began to have sex with his acquaintances, that she was *not*

a minor when she claimed to have had sex with any such people.

59.          Moreover, Ms. Giuffre has perjured herself by claiming that she was 15

when she met Ms. Maxwell and Mr. Epstein, most notably by submitting an untruthful

declaration in the *Edwards* defamation lawsuit.  On November 20, 2015 Ms. Giuffre executed

an affidavit in which she alleged that: "In approximately 1999, when I was 15 years old, I met

Ghislaine Maxwell . . . Soon after that I went to Epstein's home in Palm Beach on El Brillo

Way.  From the first time I was taken to Epstein's mansion that day, his motivations and actions

were sexual, as were Maxwell's…. Epstein and Maxwell forced me into sexual activity with

Epstein. I was 15 years old at the time."  Ex. W at ¶ 4-5 (Declaration of Virginia Roberts,

January 21, 2015).

60.          She also asserted that when she "was approximately 15 or 16 years old"

when Mr. Epstein and Ms. Maxwell began trafficking her to Epstein's acquaintances. These

statements are disproven by documentary evidence.

### Conclusion

61.          In his Declaration before this Court, Paul Cassell has provided an

accounting of the "evidence" that he claims supports the truth of Virginia Roberts Giuffre's

accusations against me.  It is a woefully inadequate presentation, as the preceding paragraphs

demonstrate.  The irony, of course, is that Mr. Cassell's accounting is in service to his and his

client's goal of keeping sealed far more compelling evidence—namely, the Requested

Documents—that undercuts the accusations against me and shows them to be a recent

fabrication.   This is part of an overarching plan by Ms. Giuffre's lawyers to cherry-pick the

evidence they want to *publically* reveal while using this Court's powers to suppress evidence

damaging to them.   There is a further irony as well, which is that the entire basis of Ms.

Giuffre's participation in the CVRA Action was a complaint that the Government unlawfully

kept secret the details of her alleged victimization at Mr. Epstein's hands.   Yet it is now Ms.

Giuffre and her lawyers who are seeking to keep secret the whole truth about Ms. Giuffre's

story.[13]

62.          I believe that the law and basic notion of fairness should permit me to

prove the whole truth, namely, that Ms. Giuffre never accused me of misconduct until 2014, and

that her belated complaint against me is, as I have always said, a fabrication from start to finish.

The Requested Documents help prove those critical points.   This Court ought not allow itself to

be a tool of secrecy used by Ms. Giuffre and her lawyers to keep the whole truth from coming

out.

---

[13] As described in my opening Declaration, Ms. Giuffre's legal assault on me, conducted through her lawyers at Boies Schiller & Flexner LLP ("BSF"), continues in the form of a motion for sanctions in Florida state court. There, she claims that I violated a court order in the *Edwards* defamation lawsuit by testifying truthfully in a deposition about discussions that I had had with David Boies.  Prior to my testimony, my lawyers submitted an affidavit from me to the Florida court describing these discussions, and the Florida judge sealed the affidavit.  He did not direct that I refrain from testifying about the matter,  nor did he sanction me for disclosing the discussion in an affidavit, as Ms. Giuffre's lawyers requested. When asked whether he was making a ruling on the BSF motion for sanctions regarding the content of the affidavit, Judge Lynch replied "No. I'm just sealing these [the affidavit] because I think they should be sealed."  Ex. X at 24 (Transcript of Emergency Motion to Seal, December 18, 2015). Thus, contrary to the later motion for sanctions, there was no "gag order" placed in me when the affidavit was submitted, nor did I violate any court order by truthfully answering a question put to me by the opposing lawyer and offering to seal my answer.  The BSF motion for sanctions was subsequently dismissed for lack of jurisdiction and standing, and is now being appealed by Ms. Giuffre.

A-1360

Dated:    September 14, 2016
          New York, New York

_____
ALAN M. DERSHOWITZ

**A-1361**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/27/17

------------------------------------------X

VIRGINIA GIUFFRE,

                    Giuffre,                                    15 Civ. 7433

      -against-

                                                               OPINION

GHISLAINE MAXWELL,

                    Maxwell.

------------------------------------------X

A P P E A R A N C E S:

            Counsel for Giuffre

            BOIES, SCHILLER & FLEXNER LLP
            401 East Las Olas Boulevard, Suite 1200
            Fort Lauderdale, FL 33301
            By:  Sigrid S. McCawley, Esq.
                 Meredith L. Schultz, Esq.

            Counsel for Maxwell

            HADDON, MORGAN AND FOREMAN, P.C.
            150 East Tenth Avenue
            Denver, CO 80203
            By:  Laura A. Menninger, Esq.
                 Jeffrey S. Pagliuca, Esq.

**Sweet, D.J.**

      The defendant Ghislaine Maxwell ("Maxwell" or the "Maxwell") has moved pursuant to Rule 56, Fed. R. Civ. P., for summary judgment dismissing the complaint of plaintiff Virginia L. Giuffre ("Giuffre" or the "Giuffre") alleging defamation. Upon the facts and conclusions set forth below, the motion is denied.

      The contested facts derived from discovery subject to the Protective Order of March 17, 2016 have been redacted.

**I.   Prior Proceedings**

      Since the filing of the complaint on September 21, 2015, setting forth Giuffre's claim of defamation by Maxwell, this action has been vigorously litigated, as demonstrated by the 704 docket entries as of March 8, 2017. At issue is the truth or falsity of a January 2015 statement issued by Maxwell. Discovery has proceeded, a joint pretrial order has been filed, and the action is set for trial on May 15, 2017. The instant motion was heard and marked fully submitted on February 16, 2017.

II.   The Facts

The facts have been set forth in Maxwell's Memorandum
of Law in Support of Maxwell's Motion for Summary Judgment,
Southern District of New York, Local Rule 56.1; Giuffre's
Statement of Contested Facts and Giuffre's Undisputed Facts; and
Maxwell's Reply to Giuffre's Statement of Contested Facts and
Giuffre's Undisputed Facts pursuant to Local Civil Rule 56.1.
They are not in dispute except as noted below.



Case 16-3945, Document 73, 08/24/2017, 2109804, Page60 of 132

Case 16-3945, Document 73, 08/24/2017, 2109804, Page63 of 132

A-1367



Case 16-3945, Document 73, 08/24/2017, 2109804, Page64 of 132





Case 16-3945, Document 73, 08/24/2017, 2109804, Page66 of 132



Case 16-3945, Document 73, 08/24/2017, 2109804, Page67 of 132











Case 16-3945, Document 73, 08/24/2017, 2109804, Page73 of 132



A-1378





19

Case 16-3945, Document 73, 08/24/2017, 2109804, Page76 of 132

A-1380



21





A-1384

A-1386











Case 16-3945, Document 73, 08/24/2017, 2109804, Page91 of 132

A-1395



Case 16-3945, Document 73, 08/24/2017, 2109804, Page92 of 132

A-1396



Case 16-3945, Document 73, 08/24/2017, 2109804, Page93 of 132

A-1397



Case 16-3945, Document 73, 08/24/2017, 2109804, Page96 of 132

A-1400



41

42

A-1403

A-1407



A-1410

### III.   The Applicable Standard

Summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Id.* The relevant inquiry on application for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. A court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial. *Westinghouse Elec. Corp. v. N.Y. City Transit Auth.*, 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990) (quoting *Anderson*, 477 U.S. at 249). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original).

While the moving party bears the initial burden of showing that no genuine issue of material fact exists, *Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir. 2005), in cases where the non-moving party bears the burden of persuasion at trial, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "It is ordinarily sufficient for the movant to point

53

A-1414

to a lack of evidence . . . on an essential element of the non-

movant's claim . . . . [T]he nonmoving party must [then] come

forward with admissible evidence sufficient to raise a genuine

issue of fact for trial . . . ." *Jaramillo v. Weyerhaeuser Co.*,

536 F.3d 140, 145 (2d Cir. 2008) (internal citations omitted);

*see also Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d

14, 18 (2d Cir. 1995) ("Once the moving party has made a

properly supported showing sufficient to suggest the absence of

any genuine issue as to a material fact, the nonmoving party ...

must come forward with evidence that would be sufficient to

support a jury verdict in his favor").

IV.   **The Motion for Summary Judgment on Republication Grounds is
      Denied**

Maxwell has moved for summary judgment dismissing

Giuffre's complaint on the grounds that Maxwell is not liable

for the republication of her Press Release by the media. Because

as a matter of law the issuer of a press release is responsible

for its publication, the motion is denied.

In New York, liability for a republication "must be

based on real authority to influence the final product." *Davis*

*v. Costa-Gavras*, 580 F. Supp. 1082, 1096 (S.D.N.Y. 1984); *see
also Hoffman v. Landers*, 146 A.D.2d 744, 747 (N.Y. App. Div. 2d
Dep't 1989) ("One who makes a defamatory statement is not
responsible for its recommunication without his authority or
request by another over whom he has no control."). Where a
defendant "had no actual part in composing or publishing," he
cannot be held liable "without disregarding the settled rule of
law that no man is bound for the tortious act of another over
whom he has not a master's power of control." *Davis*, 580 F.
Supp. at 1096 (internal quotation marks and citation omitted).
The New York Court of Appeals summarized New York's
republication liability standard in *Geraci v. Probst*, 938 N.E.2d
917 (N.Y. 2010), stating that

> one who . . . prints and publishes a libel[] is
> not responsible for its voluntary and
> unjustifiable repetition, without his authority
> or request, by others over whom he has no control
> and who thereby make themselves liable to the
> person injured, and that such repetition cannot
> be considered in law a necessary, natural and
> probable consequence of the original slander or
> libel.

938 N.E.2d at 921 (internal quotation marks and citation
omitted). Thus, "conclusive evidence of lack of actual authority
[is] sufficiently dispositive that the [court] 'ha[s] no option
but to dismiss the case . . . .'" *Davis*, 580 F. Supp. at 1096

(quoting *Rinaldi v. Viking Penguin, Inc.*, 420 N.E.2d 377, 382
(N.Y. 1981)).

However, New York law assigns liability to individuals
for the media's publication of press releases. New York
appellate courts have held that an individual is liable for the
media publishing that individual's defamatory press release. *See*
*Levy v. Smith*, 132 A.D.3d 961, 962-63 (N.Y. App. Div. 2d Dep't
2015) ("Generally, [o]ne who makes a defamatory statement is not
responsible for its recommunication without his authority or
request by another over whom he has no control . . . . Here,
however, . . . the appellant intended and authorized the
republication of the allegedly defamatory content of the press
releases in the news articles."); *see also* RESTATEMENT (SECOND) OF
TORTS § 576 (1977) ("The publication of a libel or slander is a
legal cause of any special harm resulting from its repetition by
a third person if . . . the repetition was authorized or
intended by the original defamer, or . . . the repetition was
reasonably to be expected.")

The facts as set forth above establish that Maxwell
approved the Press Release. The Press Release was sent to
between six and 30 media representatives by Gow as an employee

of Acuity Reputation, the public relations firm hired by
Maxwell. The initial sentence of the Press Release – "Please
find attached a quotable statement on behalf of Maxwell" –
communicates Maxwell's authorization for the media recipients of
the Press Release to publish it. *See Nat'l Puerto Rican Day
Parade, Inc. v. Casa Pubs., Inc.*, 79 A.D.3d 592, 595 (N.Y. App.
Div. 1st Dep't 2010) (affirming the refusal to dismiss
defamation counts against a defendant who "submitted an open
letter that was published in [a] newspaper, and that [the
defendant] paid to have the open letter published," finding that
the defendant "authorized [the newspaper] to recommunicate his
statements.").

Maxwell has cited *Geraci v. Probst* in support of her
position, but *Geraci* is distinguishable from the instant action.
In *Geraci*, the defendant sent a letter to the Board of Fire
Commissioners, and, more than three years later, a newspaper
published the letter. The court held that the defendant was not
liable for that belated publication, "made years later without
his knowledge or participation." 938 N.E.2d at 919. Here, unlike
in *Geraci*, the Press Release was not published "without [her]
authority or request," but rather with Maxwell's authority and

A-1418

by her express request. Gow's testimony establishes Maxwell's

authority and control over the Press Release:

> Q.   When you sent that email were you acting pursuant to
>      Ms. Maxwell's retention of your services?
>
> A.   Yes, I was
>
>      ***
>
> Q.   The subject line does have "FW" which to me indicates
>      it's a forward. Do you know where the rest of this
>      email chain is?
>
> A.   My understanding of this is: It was a holiday in the
>      UK, but Mr. Barden was not necessarily accessible at
>      some point in time, so this had been sent to him
>      originally by Ms. Maxwell, and because he was
>      unavailable, she forwarded it to me for immediate
>      action. I therefore respond, "Okay, Ghislaine, I'll go
>      with this."
>
>      It is my understanding that this is the agreed
>      statement because the subject of the second one is
>      "Urgent, this is the statement" so I take that as an
>      instruction to send it out, as a positive command:
>      "This is the statement."

Maxwell also cites *Davis v. Costa-Gavras*, involving a

libel claim against an author who wrote a book about a military

coup in Chile. 580 F. Supp. at 1085. Years after the author

published the book, a third-party publishing house republished

the book in paperback form and a third-party filmmaker released

a movie based on the book. The book author did not actually

participate in the republications, though he was aware of the

projects. The court held that the author of the book could not

be held liable for the republications, explaining that a "party

who is 'innocent of all complicity' in the publication of a

libel cannot be held accountable." 580 F. Supp. at 1094

(internal citations omitted). The court further noted that

"active participation in implementing the republication

resurrects the liability." *Id.* Likewise, in *Karaduman v.*

*Newsday, Inc.*, 416 N.E.2d 557 (1980), also cited by Maxwell, the

court held that reporters of a series of articles on narcotics

trade "cannot be held personally liable for injuries arising

from [the] subsequent republication in book form absent a

showing that they approved or participated in some other manner

in the activities of the third-party republisher." *Id.* at 559-

560. However, the court explicitly noted that this result was

required because "the record [wa]s barren of any concrete

evidence of the reporters' involvement in the republication of

the newspaper series." *Id.* at 540.


Here, there is evidence in the record that Maxwell

"actively participated" in influencing the media to publish the

Press Release, *Davis*, 580 F. Supp. at 1094, and "approved" of

and sought the publication of the press release, *Karaduman*, 416

N.E.2d at 560. Maxwell retained a public relations media

59

**A-1420**

specialist. The Press Release was sent by Maxwell's express request. Gow's testimony about the process leading up to the dissemination of the Press Release indicates that Maxwell did, indeed, "authorize or intend" for the media recipients to publish the statement. Because there are sufficient facts to demonstrate Maxwell's authority and control over the publication of the Press Release, Maxwell's liability for the Press Release's publication survives the motion for summary judgment.

Maxwell has additionally asserted that subjecting her to liability for republication is "particularly unfair" because excerpts of the Press Release, rather than the whole statement, were published. Def.'s Reply at 9. Maxwell cites to *Rand v. New York Times Co.*, 75 A.D.2d 417 (N.Y. App. Div. 1st Dep't 1980), in which a newspaper paraphrased the defendant's opinion, essentially "excis[ing] the opinion from the context in which it was given." *Id.* at 424. No similar alteration, sanitization, hyperbolizing, or paraphrasing of Maxwell's statements has been established here. Nor does the record establish that any statements of Maxwell's were taken out of context; rather, they were directly quoted, accurately and unchanged. The publication of Maxwell's statement that Giuffre's claims are "obvious lies"

**A-1421**

does not distort or misrepresent the message Maxwell intended to convey to the public with the Press Release.

Because the purpose of the issuance of the Press Release was publication, Maxwell is liable for its content and the motion for summary judgment on the grounds of non-liability for republication is denied.

## V.  The Motion for Summary Judgment to Dismiss the Defamation Claim on the Ground of Substantial Truth is Denied

Maxwell has asserted that the Press Release is substantially true and that the defamation claim should therefore be dismissed. *See* Def.'s Br. at 39. Whether or not Giuffre lied about Maxwell's involvement in the events that Giuffre has alleged took place is the intensely contested factual issue that is the foundation of this action. Accordingly, summary judgment is not appropriate. See *Mitre Sports Intern. Ltd. v. Home Box Office, Inc.*, 22 F. Supp. 3d 240, 255 (S.D.N.Y. 2014) (denying summary judgment because it would require the Court to decide disputed facts to determine whether the statement at issue was substantially true); *Da Silva v. Time Inc.*, 908 F. Supp. 184, 187 (S.D.N.Y. 1995) (denying motion for summary judgment because there was a genuine issue of

61

material fact as to whether defamatory photo and caption were
true).

Under New York law, "truth is an absolute, unqualified
defense to a civil defamation action" and "'substantial truth'
suffices to defeat a charge of libel." Jewell v. NYP Holdings,
Inc., 23 F. Supp. 2d 348, 366 (S.D.N.Y. 1998) (internal
quotation marks and citations omitted). A statement is
substantially true if the statement would not "have a different
effect on the mind of the reader from that which the pleaded
truth would have produced." Id. (quoting Fleckenstein v.
Friedman, 193 N.E. 537, 538 (N.Y. 1934)). Thus, "it is not
necessary to demonstrate complete accuracy to defeat a charge of
libel. It is only necessary that the gist or substance of the
challenged statements be true." Printers II, Inc. v.
Professionals Publishing, Inc., 784 F.2d 141, 146 (2d Cir.
1986); see also Korkala v. W.W. Norton & Co., 618 F.Supp. 152,
155 (S.D.N.Y. 1985) ("Slight inaccuracies of expression are
immaterial provided that the defamatory charge is true in
substance.") (internal quotation marks and citation omitted);
Sharon v. Time, Inc., 609 F.Supp. 1291, 1294 (S.D.N.Y. 1984)
("Defendant is permitted to prove the substantial truth of this
statement by establishing any other proposition that has the

62

same 'gist' or 'sting' as the original libel, that is, the same effect on the mind of the reader.").

The Honorable Loretta A. Preska has noted that cases addressing whether a statement is substantially true "fall along a broad spectrum." *Jewell*, 23 F. Supp. at 367. There are cases in which a statement is non-actionable because it is completely true. *See, e.g., Carter*, 233 A.D.2d 473, 474 (N.Y. App. Div. 2d Dep't 1996) (claim that defendant committed libel by informing the authorities that plaintiff was endorsing checks made payable to the defendant and depositing them in plaintiff's account held non-actionable where plaintiff had in fact endorsed checks made payable to the defendant). There are cases where "one struggles to identify any area of ambiguity as to truth." *Jewell*, 23 F. Supp. at 368; *see, e.g., Miller v. Journal-News*, 211 A.D.2d 626, 627 (N.Y. App. Div. 2d Dep't 1995) (statement that plaintiff was "suspended" substantially true where plaintiff was placed on "administrative leave"). There are cases where the line between the statement and the admitted truth is more tenuous, but the overall "gist" cannot be said to be substantially different. *See, e.g., Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 302-03 (2d Cir. 1986) (holding that statement which implied that plaintiff was then currently an adulterer was substantially true

63

where plaintiff had ceased being an adulterer but had

"unabashedly committed adultery" for thirteen of seventeen

years). Finally, there are "those cases in which a defendant

simply asks too much in asserting that a statement is

substantially true because the difference between the two is

plainly substantial." *Jewell*, 23 F. Supp. at 368. For example,

the court in *Da Silva*, 908 F. Supp. at 186-87, held that a

photograph of plaintiff which identified her as a prostitute was

not substantially true where the plaintiff had been a prostitute

for some six years but was not at the time of publication.


        After reviewing this spectrum of cases, the facts upon

which Maxwell bases her argument are insufficient to allow this

Court to find substantial truth as a matter of law. A material

dispute of fact exists as to the "admitted truth" or the

"reality" in this case. ███████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████ The details and

significance of the facts offered are highly contested, and

therefore cannot establish the "substantial truth" of the Press

Release. "[R]easonable jurors could conclude that the statements

A-1425

. . . are not substantially true." *Boehner v. Heise*, 734 F. Supp. 2d 389, 399 (S.D.N.Y. 2010).

The motion for summary judgment to dismiss the defamation on the ground of substantial truth is denied as not having been established by undisputed material facts.

## VI.   The Defamation Claim is Not Barred by New York Law

Maxwell has moved to dismiss the complaint on the ground that the Press Release is opinion and protected by the pre-litigation privilege under New York law. Because New York law does not support Maxwell's position, the motion for summary judgment based on the characterization of the Press Release as opinion and as protected by a pre-litigation privilege is denied.

### 1.   *The Press Release is Not Opinion.*

As previously held, Maxwell's statement that Giuffre's claims of sexual assault are lies is not an expression of opinion:

65

> First, statements that Giuffre's claims 'against
> [Maxwell] are untrue,' have been 'shown to be
> untrue,' and are 'obvious lies' have a specific
> and readily understood factual meaning: that
> Giuffre is not telling the truth about her
> history of sexual abuse and [Maxwell]'s role, and
> that some verifiable investigation has occurred
> and come to a definitive conclusion proving that
> fact. Second, these statements (as they
> themselves allege), are capable of being proven
> true or false, and therefore constitute
> actionable fact and not opinion. Third, in their
> full context, while [Maxwell]'s statements have
> the effect of generally denying Giuffre's story,
> they also clearly constitute fact to the reader.

*Giuffre v. Maxwell*, 165 F. Supp. 3d 147, 152 (S.D.N.Y. 2016).

This Court further concluded that

> [Giuffre] cannot be making claims shown to be
> untrue that are obvious lies without being a
> liar. Furthermore, to suggest an individual is
> not telling the truth about her history of having
> been sexually assaulted as a minor constitutes
> more than a general denial, it alleges something
> deeply disturbing about the character of an
> individual willing to be publicly dishonest about
> such a reprehensible crime. [Maxwell]'s
> statements clearly imply that the denials are
> based on facts separate and contradictory to
> those that [Giuffre] has alleged.

*Id.*

Maxwell argues that the "context" of the entire

statement "tested against the understanding of the average

reader" should be that of a press release as a whole being read

only by journalists. Def.'s Br. at 22 (quoting *Aronson v.*

*Wiersma*, 483 N.E.2d 1138, 1139 (1985)). However, the ultimate

audience for a press release is the public. The motion to

dismiss opinion clearly addressed this issue:

> Sexual assault of a minor is a clear-cut issue;
> either transgression occurred or it did not.
> Either Maxwell was involved or she was not. The
> issue is not a matter of opinion, and there
> cannot be differing understandings of the same
> facts that justify diametrically opposed opinion
> as to whether Maxwell was involved in Giuffre's
> abuse as Giuffre has claimed. Either Giuffre is
> telling the truth about her story and Maxwell's
> involvement, or Maxwell is telling the truth and
> she was not involved in the trafficking and
> ultimate abuse of Giuffre.

*Giuffre*, 165 F. Supp. at 152.

Maxwell has urged that these conclusions at the motion

to dismiss stage should be revisited and revised when

considering the summary judgment motion since the standard for

deciding a Rule 12(b)(6) motion is different from the standard

for deciding a Rule 56 motion. In deciding a 12(b)(6) motion,

the court must accept as true the factual allegations and draw

all inferences in the plaintiff's favor; a plaintiff need only

state a claim that is "plausible on its face." *Id.* at 149

(internal quotation marks and citation omitted). In contrast,

for a Rule 56 motion, the plaintiff defending the motion may not

"rest on [the] allegations" in her complaint. *Anderson*, 477 U.S.

at 249.

In deciding its motion to dismiss opinion, the Court
relied on *Davis v. Boeheim*, 22 N.E.3d 999 (2014), and held that
the three allegedly defamatory statements in the Press Release
have a specific and readily understood factual meaning, are
capable of being proven true or false, and "clearly constitute
fact to the reader." *Giuffre*, 165 F. Supp. at 152. The Court
determined that "[t]he dispositive inquiry" for purposes of
deciding whether an allegedly defamatory statement is fact or
nonactionable opinion is whether "a reasonable reader could have
concluded that the statements were conveying facts about the
plaintiff." *Id.* at 151 (internal quotation marks and citation
omitted). To answer that inquiry, three factors enumerated in
*Davis* were applied. *See id.* These three factors are the same as
the four factors in *Immuno AG v. Moor-Jankowski*, 567 N.E.2d 1270
(N.Y. 1991); the difference is that the *Davis* court collapsed
the *Immuno AG's* third and fourth factors into one. *See Davis*, 22
N.E.3d at 1005. "[T]he critical aspect of the inquiry, as
articulated in the third factor set forth above, is to view the
statements in context." *Jewell*, 23 F. Supp. 2d at 377. This
contextual analysis "proceeds on two levels, the 'broader social
setting' of the statements, as well as their 'immediate
context.'" *Id.* (citing *Immuno*, 567 N.E.2d at 1280).

Maxwell acknowledges that the Court properly applied
*Davis* at the motion to dismiss stage, but argues that the third
factor, especially, benefits from the evidence presented in the
motion for summary judgment. *See* Def.'s Br. at 32. In other
words, Maxwell argues that "the Court did not have the 'full
context'" of the Press Release or the "broader social context
and surrounding circumstances of the statement." *Id.* At the
motion to dismiss stage, the text of the Press Release had not
yet been produced, nor had there been production of emails or
deposition testimony regarding the Press Release.

The developed record necessitates the same conclusion
as at the motion to dismiss stage. The context and surrounding
circumstances remain the same. The publication was intended by
Maxwell to reach the average reader, not simply the reporters,
Barden's intent, a factual issue in contest, notwithstanding.
The issue of truth or falsity is a factual determination, not a
matter of opinion. *See Giuffre*, 165 F. Supp. 3d at 152
("[S]tatements that Giuffre's claims 'against [Maxwell] are
untrue,' have been 'shown to be untrue,' and are 'obvious lies'
have a specific and readily understood factual meaning.").

69

> 2.   *The Pre-Litigation Privilege is Inapplicable.*

Maxwell has contended that the pre-litigation privilege as enunciated in *Front, Inc. v. Khalil,* 28 N.E.3d 15, 16 (N.Y. 2015), applies. *See* Def.'s Br. at 33.

"A privileged communication is one which, but for the occasion on which it is uttered, would be defamatory and actionable." *Park Knoll Assocs. v. Schmidt,* 451 N.E.2d 182, 184 (N.Y. 1983). "[I]t is well-settled that statements made in the course of litigation are entitled to absolute privilege." *Front,* 28 N.E.3d at 18. The privilege that protects statements made in the course of litigation "can extend to preliminary or investigative stages of the process, particularly where compelling public interests are at stake." *Rosenberg v. MetLife, Inc.,* 866 N.E.3d 439, 443 (N.Y. 2007). In *Front,* the New York Court of Appeals ruled that the privilege for "statements made by attorneys prior to the commencement of litigation" is qualified rather than absolute. *Id.* at 16. Specifically, the Court held that an attorney's statements made before litigation has commenced are privileged if (1) the attorney has "a good faith basis to anticipate litigation" and (2) the statements are "pertinent to that anticipated litigation." *Id.* at 20.

The anticipated litigation, according to the Press
Release, was "redress at the repetition of such old defamatory
claims." *See* Press Release. According to Barden, Maxwell's
lawyer, he participated in the preparation of the Press Release,
the purpose of the Press Release was to dissuade the media from
publishing Giuffre's allegations, and the implication of the
Press Release was that any redress sought by Maxwell would be
against the media. Giuffre has disputed Barden's claim that the
Press Release was his own statement.

Certain of the cases cited by Maxwell in support of
the privilege can be distinguished, according to Giuffre, in
that they involve communications to or from parties to the
ultimate litigation. *See, e.g., Kirk v. Heppt*, 532 F. Supp. 2d
586, 593 (S.D.N.Y. 2008) (the communication at issue was made by
an attorney's client to the attorney's malpractice carrier
concerning the client's justiciable controversy against the
attorney over which the clients actually sued); *Black v. Green
Harbour Homeowners' Ass'n, Inc.*, 19 A.D.3d 962, 963 (N.Y. App.
Div. 3d Dep't 2005) (privilege applied to a letter sent by a
home owner's association board of directors to the association's
members informing them of the status of litigation to which the

71

association was a party). Giuffre contends that "there was no
statement made by anyone before the commencement of litigation
because litigation never commenced." *See* Pl.'s Opp'n at 42.

Here, the communication at issue was sent to members
of the media, and no litigation took place between Maxwell and
the media recipients of the Press Release.

However, the pre-litigation privilege is not limited
to statements between parties and their lawyers. "While the
communications at issue in *Front* were among lawyers and
potential parties, the New York Court of Appeals did not
explicitly require the recipient of the challenged statements to
be a lawyer or potential party." *Feist v. Paxfire, Inc.*, No. 11
CIV. 5436 (LGS), 2017 WL 177652, at *5 (S.D.N.Y. Jan. 17, 2017);
*see Front*, 28 N.E.3d at 16-17. The Second Circuit "summarily
rejected this interpretation when it applied *Front* to an
attorney's communications to the press." *See Tacopina v.
O'Keeffe*, 645 F. App'x 7, 8 (2d Cir. 2016) ("Even crediting [the
plaintiff]'s allegation that [the attorney] shared the affidavit
with the Daily News before filing it in court, Tacopina has
still not sustained his burden of showing that the statements
were not pertinent to a good faith anticipated litigation.").

Though a statement made to a non-party may be privileged, the pre-litigation privilege does not apply here because the Press Release cannot be considered a "statement[] made by [an] attorney." *Front*, 28 N.E.3d at 16. Whether Maxwell's attorney, Barden, had a hand in drafting the Press Release, and the extent to which he may have been involved, is a disputed issue of fact. The record evidence establishes that, regardless, the Press Release is properly attributable to Maxwell. Maxwell retained a public relations firm and sent her representative there, Gow, a forwarded email with the statements that were to be used in the Press Release. Maxwell instructed Gow to send it, as he testified in his deposition. While Maxwell herself did not disseminate the email to the media recipients, neither did Barden. The statement was sent out by Gow.

Additionally, the alleged defamatory statements in the Press Release were attributed to Maxwell, and not to her attorney or his agents. The email stated that the Press Release was a "statement on behalf of" Maxwell and notified the media recipients that "[n]o further communication will be provided by her [Maxwell] on this matter." There is no evidence in the email

73

that the Press Release was anything near an attorney's
statement; Barden was not even copied on the email.

The pre-litigation privilege is intended to protect
attorneys from defamations claims "so that those discharging a
public function may speak freely to zealously represent their
clients without fear of reprisal or financial hazard." *Id.* at
18. Where the statement cannot be attributed to an attorney,
there is no justification for protecting it by privilege.

In addition, as this Court concluded in denying
Maxwell's motion to dismiss, "[t]here is no qualified privilege
under New York law when such statements are spoken with malice,
knowledge of their falsity, or reckless disregard for their
truth." *Giuffre*, 165 F. Supp. 3d at 155 (internal quotation
marks and citation omitted). It is Giuffre's contention that
Maxwell knew the statements were false because she engaged in
and facilitated the sexual abuse of Giuffre. Therefore,
according to Giuffre, they were not made in good faith
anticipation of litigation, and instead were made for the
inappropriate purpose of "bully[ing]," "harass]ment]," and
"intimid[ation]." *See Front*, 28 N.E.3d at 19 (2015). According
to Giuffre, there is ample record evidence that Maxwell acted

74

with malice in issuing the Press Release, thereby making the
pre-litigation privilege inapplicable.

Because of the existence of triable issues of material
fact rather than opinion and because the pre-litigation
privilege is inapplicable, the motion for summary judgment is
denied.

VII.   Conclusion

For the reasons set forth above, the motion for summary judgment is denied.

The parties are directed to jointly file a proposed redacted version of this Opinion consistent with the Protective Order or notify the Court that none are necessary within one week of the date of receipt of this Opinion.

It is so ordered.

New York, NY
March 22, 2017

ROBERT W. SWEET
U.S.D.J.

76