# 16-3945(L),
# 17-1625 (CON), 17-1722 (CON)

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

VIRGINIA L. GIUFFRE,
Plaintiff-Appellee,
v.
GHISLAINE MAXWELL
Defendant,
v.
SHARON CHURCHER, JEFFREY EPSTEIN,
Respondents,
v.
ALAN M. DERSHOWITZ, MICHAEL CERNOVICH, DBA CERNOVICH MEDIA,
Intervenors-Appellants.

On Appeal from the United States District Court
for the Southern District of New York

**BRIEF OF *AMICI CURIAE* THE REPORTERS COMMITTEE
FOR FREEDOM OF THE PRESS AND 18 MEDIA ORGANIZATIONS
IN SUPPORT OF INTERVENORS-APPELLANTS**

Bruce D. Brown
*Counsel of Record for Amici Curiae*
Gregg P. Leslie
Caitlin Vogus
THE REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th Street NW, Ste. 1250
Washington, D.C. 20005
(202) 795-9300

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1 and 29(a)(4)(A) of the Federal Rules of Appellate Procedure, *amici curiae* certify that:

The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

American Society of News Editors is a private, non-stock corporation that has no parent.

The Associated Press Media Editors has no parent corporation and does not issue any stock.

Association of Alternative Newsmedia has no parent corporation and does not issue any stock.

Bay Area News Group is owned and operated by California Newspapers Partnership, a subsidiary of the privately-held Media NewsGroup.

Daily News, L.P. is a subsidiary of tronc, Inc., which is publicly held. Merrick Media, LLC, Nant Capital, LLC, Oaktree Capital Management, L.P., and HG Vora Capital Management, LLC each own 10 percent or more of tronc, Inc.'s stock.

The E.W. Scripps Company is a publicly traded company with no parent company. No individual stockholder owns more than 10% of its stock.

First Amendment Coalition is a nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

First Look Media Works, Inc. is a non-profit non-stock corporation organized under the laws of Delaware. No publicly-held corporation holds an interest of 10% or more in First Look Media Works, Inc.

Gannett Co., Inc. is a publicly traded company and has no affiliates or subsidiaries that are publicly owned. No publicly held company holds 10% or more of its stock.

The International Documentary Association is an not-for-profit organization with no parent corporation and no stock.

The Investigative Reporting Workshop is a privately funded, nonprofit news organization affiliated with the American University School of Communication in Washington. It issues no stock.

MPA - The Association of Magazine Media has no parent companies, and no publicly held company owns more than 10% of its stock.

National Press Photographers Association is a 501(c)(6) nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

New England First Amendment Coalition has no parent corporation and no stock.

Online News Association is a not-for-profit organization. It has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

Radio Television Digital News Association is a nonprofit organization that has no parent company and issues no stock.

Society of Professional Journalists is a non-stock corporation with no parent company.

The Tully Center for Free Speech is a subsidiary of Syracuse University.

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................ v

STATEMENT OF IDENTITY AND INTERST OF *AMICI CURIAE* ................... 1

SOURCE OF AUTHORITY TO FILE .................................................... 2

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................... 3

ARGUMENT ............................................................................................ 4

   I.   Broad sealing without a judicial determination of compelling need undermines the public's First Amendment and common law rights of access to judicial proceedings and records. ............................................. 4

  II.  The Court should consider the function of records filed in connection with discovery motions in determining whether they are judicial records subject to the common law presumption of access. .................................. 10

 III.  The district court erred in treating Appellants' motion to unseal as a motion to modify a protective order. ....................................................... 14

 IV.  The district court did not consider the public's significant and legitimate interest in access to the judicial records in this case. .................................. 16

  V.  No compelling or countervailing interest overcomes the public's First Amendment or common law rights of access to the sealed records. ............ 18

CONCLUSION .................................................................................... 20

APPENDIX A:  DESCRIPTION OF *AMICI* ......................................... 23

APPENDIX B:  ADDITIONAL COUNSEL ........................................... 27

# TABLE OF AUTHORITIES

## CASES

*Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*,
   814 F.3d 132 (2d Cir. 2016) ............................................................... 11, 16

*Citizens First Nat'l Bank v. Cincinnati Ins. Co.*,
   178 F.3d 943 (7th Cir. 1999) .................................................................. 9

*City of Hartford v. Chase*,
   942 F.2d 130 (2d Cir. 1991) ................................................................... 8

*DiRussa v. Dean Witter Reynolds Inc.*,
   121 F.3d 818 (2d Cir. 1997) ................................................................. 19

*Doe v. United States*,
   9:08-cv-80736-KAM (S.D. Fla.) ........................................................... 17

*Globe Newspaper Co. v. Superior Court*,
   457 U.S. 596 (1982) ......................................................................... 5, 19

*GMAC Bank v. HTFC Corp.*,
   248 F.R.D. 182 (E.D. Pa. 2008) ........................................................... 12

*Hall v. Clifton Precision*,
   150 F.R.D. 525 (E.D. Pa. 1993) ........................................................... 13

*In re N.Y. Times Co.*,
   828 F.2d 110 (2d Cir. 1987) ................................................................. 20

*In re Sept. 11 Litig.*,
   262 F.R.D. 274 (S.D.N.Y. 2009) .......................................................... 14

*Lugosch v. Pyramid Co. of Onondaga*,
   435 F.3d 110 (2d Cir. 2006) ..........................................................*passim*

*Martindell v. Int'l Tel. & Tel. Corp.*,
   594 F.2d 291 (2d Cir. 1979) ................................................................. 15

*Mokhiber v. Davis*,
   537 A.2d 1100 (D.C. 1988) .................................................................. 12

*Newsday LLC v. Cty. of Nassau*,
   730 F.3d 156 (2d Cir. 2013) ................................................................. 11

*Nixon v. Warner Comm'ns, Inc.*,
   435 U.S. 589 (1978) .............................................................................. 9

*Press-Enter. Co. v Superior Court*,
    464 U.S. 501 (1984) ................................................................ 5, 8, 19

*Press-Enter. v. Superior Court*,
    478 U.S. 1 (1986) ................................................................ 18

*Quela v. Payco-Gen. Amer. Credits, Inc.*,
    No. 99 C 1904, 2000 WL 656681 (N.D. Ill. May 18, 2000) ............................ 13

*Richmond Newspapers, Inc. v. Virginia*,
    448 U.S. 555 (1980) ................................................................ 4, 5

*SEC v. TheStreet.Com*,
    273 F.3d 222 (2d Cir. 2001) ................................................................ 15

*U.S. for Use of Weston & Brooker Co. v. Continental Cas. Co.*,
    303 F.2d 91 (4th Cir. 1962) ................................................................ 13

*United States v. Amodeo*,
    44 F.3d 141 (2d Cir. 1995) ............................................ 8, 9, 10, 19

*United States v. Amodeo*,
    71 F.3d 1044 (2d Cir. 1995) ............................................ 5, 10, 11, 12

*United States v. Erie Cty.*,
    763 F.3d 235 (2d Cir. 2014) ................................................................ 4, 12

## OTHER AUTHORITIES

Andrew Soergel, *Acosta Queried on Epstein, Hiring Scandal*, U.S. News & World
    Report, Mar. 22, 2017, https://perma.cc/7UEY-RTKT ...................................... 17

Conchita Sarnoff, *Jeffrey Epstein, Billionaire Pedophile, Goes Free*, Daily Beast,
    July 20, 2010, https://perma.cc/HMC3-HQJG .................................................... 17

Jane Musgrave, *Fight to reopen teen sex case against Jeff Epstein may set
    precedent*, Palm Beach Post, Aug. 26, 2017, https://perma.cc/7J3C-GPZF ....... 18

Jane Musgrave, *Will President Trump be used as witness in sex offender Epstein
    case?*, Palm Beach Post, May 12, 2017, https://perma.cc/GPA7-QRLR ............ 16

Josh Gerstein, *The one weird court case linking Trump, Clinton, and a billionaire
    pedophile*, Politico, May 4, 2017, https://perma.cc/8D55-QGJU ...................... 17

Josh Gerstein, *Woman who sued convicted billionaire over sex abuse levels claims
    at his friends*, Politico, Dec. 31, 2014, https://perma.cc/QWC9-A2FF .............. 17

Malia Zimmerman, *Lawsuit seeks to expose, unravel plea deal for billionaire sex
    offender*, Fox News, July 18, 2016, http://fxn.ws/2aomfuk ................................ 18

Richard L. Marcus, *The Discovery Confidentiality Controversy*, 1991 U. Ill. L. Rev. 457 (1991) ................................................................................................. 13

Tom Leonard, *Prince Andrew risks losing ambassador job as girl in underage sex case reveals meeting him*, Daily Mail, Mar. 2, 2011, http://dailym.ai/2wni8s1 .............................................................................. 17, 20

**RULES**

Fed. R. App. P. 29 .................................................................................................. 1, 2

Fed. R. Civ. P. 26(c) ......................................................................................... 7, 15, 16

Local R. 29.1 ............................................................................................................. 1

## STATEMENT OF IDENTITY AND INTERST OF *AMICI CURIAE*

*Amici curiae* are the Reporters Committee for Freedom of the Press, American Society of News Editors, Associated Press Media Editors, Association of Alternative Newsmedia, Bay Area News Group, Daily News, LP, The E.W. Scripps Company, First Amendment Coalition, First Look Media Works, Inc., Gannett Co., Inc., International Documentary Assn., Investigative Reporting Workshop at American University, MPA - The Association of Magazine Media, National Press Photographers Association, New England First Amendment Coalition, Online News Association, Radio Television Digital News Association, Society of Professional Journalists, and Tully Center for Free Speech.  A supplemental statement of identity and interest of *amici* is included below as Appendix A.[1]

As representatives and members of the news media, *amici* have a strong interest in protecting the public's First Amendment and common law rights of access to court documents.  *Amici* or the journalists on whose behalf *amici* advocate regularly report on controversies pending before state and federal courts.

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E) and Local R. 29.1(b), *amici* state as follows:  (1) no party's counsel authored this brief in whole or in part; (2) no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and (3) no person—other than the *amici curiae*, their members, or their counsel—contributed money that was intended to fund preparing or submitting this brief.

Accordingly, *amici* frequently require access to court records, particularly when the records may shed light on a newsworthy event. Failure to apply the mandates of the common law and First Amendment presumptions of access to court records impinges journalists' ability to gather facts and report news to the public. *Amici* write in support of Intervenors-Appellants to emphasize the public interests implicated by the overbroad sealing of judicial records in this case.

## SOURCE OF AUTHORITY TO FILE

Counsel for Plaintiff-Appellee and Intervenors-Appellants have consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2).

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case concerns an order by the Southern District of New York (the "district court") that permitted the parties to file vast numbers of judicial records under seal or redacted in their entirety as a matter of course and without any judicial oversight. As a result, the public was denied access to the papers in support of and opposition to Defendant's motion for summary judgment and the majority of the district court's opinion denying that motion, among other documents. Intervenors-Appellants Alan Dershowitz and Michael Cernovich (collectively, "Appellants") seek access to judicial records filed in connection with Defendant's motion for summary judgment, including the opposition and reply, and Dershowitz also seeks access to judicial records filed in connection with certain discovery related motions.

This Court has long recognized that access to judicial documents is essential to the fostering of a well-informed citizenry and the integrity of our judicial system. *Amici* write to emphasize their concern with the breadth of the sealing permitted by the district court in this case, which is contrary to both the common law and First Amendment presumptions of access. In addition, *amici* also write to provide their perspective on a narrower question before this Court: the right of access to documents filed in connection with discovery motions. *Amici* argue that, in determining the applicability and strength of the common law presumption of

access to such documents, this Court should consider the documents and motions to which they are attached on a case-by-case basis. In addition, *amici* agree with Appellants that the district court erred in treating Appellants' motion to unseal as a motion to modify a protective order, rather than evaluating it under the common law and First Amendment presumptions of access. The strong public interest in access to the judicial records at issue in this case weighs in favor of their disclosure, and under the common law and First Amendment presumptions of access, no compelling interest exists to seal them.

For the reasons set forth herein and in Appellants' briefs, *amici* respectfully urge this Court to reverse the district court's order.

## ARGUMENT

### I. Broad sealing without a judicial determination of compelling need undermines the public's First Amendment and common law rights of access to judicial proceedings and records.

Openness of judicial proceedings "has long been recognized as an indispensable attribute" of the American justice system. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 569 (1980). "The notion that the public should have access to the proceedings and documents of courts is integral to our system of government." *United States v. Erie Cty.*, 763 F.3d 235, 238–39 (2d Cir. 2014).

Access to judicial proceedings and documents "permits the public to participate in and serve as a check upon the judicial process—an essential

component in our structure of self-government." *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 606 (1982). Indeed, as this Court has emphasized, the presumption of access to judicial records arises from "the need for federal courts, although independent—indeed, particularly because they are independent—to have a measure of accountability and for the public to have confidence in the administration of justice." *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995) (*Amodeo II*). Public access to judicial proceedings and records allows the public to observe and monitor the workings of the federal judiciary. *Id.* It "provides judges with critical views of their work," "deters arbitrary judicial behavior," and promotes "confidence in the conscientiousness, reasonableness, [and] honesty of judicial proceedings." *Id.* Thus, public access to judicial proceedings and documents "enhances both the basic fairness of" the judicial system "and the appearance of fairness so essential to public confidence in the system." *Press-Enter. Co. v Superior Court*, 464 U.S. 501, 508 (1984) (*Press-Enterprise I*).

In contrast, broad sealing orders that allow parties to conduct litigation in secret undermine the important benefits of access and openness. As the U.S. Supreme Court has recognized, "People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing." *Richmond Newspapers, Inc.*, 448 U.S. at 572.

In this case, the district court entered a protective order in March of 2016 that permitted the parties to designate certain information exchanged between the parties in discovery as "confidential." Protective Order, *Giuffre v. Maxwell*, 15-cv-07433-RWS (Mar. 18, 2016), ECF No. 62 (the "Protective Order"). The Protective Order also required a party who sought to file a document or material containing confidential information with the district court to file a motion to seal pursuant to Section 6.2 of the Electronic Case Filing Rules & Instructions for the Southern District of New York. *Id.*

After the parties filed numerous letter motions requesting the sealing of documents filed with the district court, the district court entered a second, one paragraph standing order on August 9, 2016 "[t]o reduce unnecessary filings and delay." Standing Order, *Giuffre v. Maxwell*, 15-cv-07433-RWS (Aug. 9, 2016), ECF No. 348 (the "Standing Order"). The Standing Order prospectively granted "letter motions to file submissions under seal pursuant to the Court's Protective Order, ECF No. 62" and amended the Protective Order "such that filing a letter motion seeking sealing for each submission is no longer necessary." *Id.* The Standing Order also provided that "[a] party wishing to challenge the sealing of any particular submission may do so by motion." *Id.*

Subsequently, the parties filed numerous documents entirely under seal or with significant redactions without first requesting judicial approval, as permitted

6

by the Standing Order.  Among other documents, the parties filed discovery

motions, over a dozen motions in *limine* and their responses, other evidentiary

motions, and the Joint Pretrial Statement under seal or almost entirely redacted.

*See, e.g.*, *Giuffre v. Maxwell*, 15-cv-07433-RWS, ECF Nos. 356, 524, 530, 535,

576, 608, 637, 665, 666, 671, 675, 679, 683, 685, 686, 689, 691, 693, 694, 768,

859.  In addition, Defendant's motion for summary judgment, Plaintiff's response,

and Defendant's reply were entirely redacted, and almost all of the attached

exhibits were filed under seal.  *See Giuffre v. Maxwell*, 15-cv-07433-RWS, ECF

Nos. 541, 542, 586, 620.  Even the district court's decision denying Defendant's

motion for summary judgment was significantly redacted, with the entirety of the

disputed facts, comprising 50 pages, redacted at the apparent request of the parties.

*Giuffre v. Maxwell*, 15-cv-07433-RWS, ECF No. 872 (Apr. 27, 2017).

    *Amici* recognize that a district court may, for good cause, issue a protective

order governing discovery.  *See* Fed. R. Civ. P. 26(c).  However, when documents

are filed for the court's use in the exercise of its Article III powers, the legal

landscape changes.  Both the common law and the First Amendment create

presumptive rights of access to judicial documents.  *See Lugosch v. Pyramid Co. of

Onondaga*, 435 F.3d 110, 120 (2d Cir. 2006).  The First Amendment requires the

court to determine that sealing of judicial records be "essential to preserve higher

values" and "narrowly tailored to serve that interest."  *Press-Enterprise I*, 464 U.S.

at 510. Similarly, the common law requires the court to determine that "the interests favoring non-access outweigh those favoring access." *United States v. Amodeo*, 44 F.3d 141, 148 (2d Cir. 1995) (*Amodeo I*).

Contrary to the requirements of the common law and First Amendment, the Standing Order provided no countervailing or compelling reason, or indeed any reason, for the sealing of vast numbers of judicial records in this case. Moreover, the Standing Order granted the parties carte blanche to litigate their dispute in secret by excusing them from seeking individualized review by the district court of requests to seal judicial records. As a result, the parties filed the bulk of their substantive filings under seal or significantly redacted, without any finding by the district court that the common law or First Amendment presumptions of access did not apply or were overcome in each instance and without any opportunity to oppose sealing in advance. *See City of Hartford v. Chase*, 942 F.2d 130, 135 (2d Cir. 1991) (holding that "sealing official documents should not be done without a compelling reason, and interested parties should be given an opportunity to challenge the propriety of a sealing order before the decision to seal is final").

The Second Circuit has made clear that it is "improper for the district court to delegate its authority" to seal a record in part to the parties. *Amodeo I*, 44 F.3d at 147. Rather, the court must "make its own redactions, supported by specific findings, after a careful review of all claims for and against access" to each portion

8

of the document that is being redacted. *Id.* The district court cannot abdicate its responsibility to ensure that the First Amendment and common law presumptions of access have been overcome before judicial records may be filed under seal. *See Citizens First Nat'l Bank v. Cincinnati Ins. Co.*, 178 F.3d 943, 945 (7th Cir. 1999). ("The judge is the primary representative of the public interest in the judicial process and is duty-bound therefore to review any request to seal the record (or part of it)."). Yet the Standing Order did precisely that. The overwhelming secrecy with which this litigation was conducted and the district court's delegation of its authority to seal judicial records to the parties is contrary to the First Amendment and common law presumptions of access.[2]

---

[2] Appellants have requested the unsealing of only certain records filed in the district court. However, the district court retains "supervisory power over its own records and files," *Nixon v. Warner Comm'ns, Inc.*, 435 U.S. 589, 598 (1978), and, accordingly, can *sua sponte* unseal additional records. Because the Standing Order improperly permitted the parties to file records under seal without judicial approval, this Court should instruct the district court, upon remand, to examine all of the records filed under seal, determine whether the common law and First Amendment presumptions of access apply to each sealed record, and unseal those that do not meet the common law and First Amendment standards for sealing.

**II.    The Court should consider the function of records filed in connection with discovery motions in determining whether they are judicial records subject to the common law presumption of access.**

Appellant Dershowitz seeks access to documents filed with the district court in connection with certain discovery motions (the "Discovery Motion Records").[3] *Amici* agree with Dershowitz that this Court has not previously ruled on whether documents filed in connection with a discovery motion are judicial documents to which the presumptions of access apply.[4]  Dershowitz Br. at 34.  In determining whether the common law presumption of access applies to the Discovery Motion Records and the weight of that presumption, the Court should consider the nature of the discovery motions to which the records were attached and the importance of the records to the district court's exercise of its Article III powers.

The common law presumption of access attaches to all "judicial documents," *Lugosch*, 435 F.3d at 119.  This Court has defined judicial documents as those that are "relevant to the performance of the judicial function and useful in the judicial process."  *Amodeo I*, 44 F.3d at 145.  In determining whether a document is a

---

[3] The specific description of the records Dershowitz seeks were redacted from the publicly filed version of his motion and brief in this Court.

[4] *Amici* recognize that this Court has stated, in *dicta*, that documents "passed between the parties in discovery lie entirely beyond the [common law] presumption's reach."  *Amodeo II*, 71 F.3d at 1050.  This statement is inapplicable to the Discovery Motion Records, which, according to Dershowitz, were actually filed with the district court in connection with discovery motions.  Br. for Intervenor-Appellant Alan M. Dershowitz at 34 ("Dershowitz Br.").

judicial record, this Court evaluates "the 'relevance of the document's specific contents to the nature of the proceeding' and the degree to which 'access to the [document] would materially assist the public in understanding the issues before the . . . court, and in evaluating the fairness and integrity of the court's proceedings.'" *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 139 (2d Cir. 2016) (quoting *Newsday LLC v. Cty. of Nassau*, 730 F.3d 156, 166–67 (2d Cir. 2013)).

Once the court has determined that a document is a judicial document, it must determine the weight of the common law presumption of access that attaches. *Lugosch*, 435 F.3d at 119. As this Court has stated,

> [T]he weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts. Generally, the information will fall somewhere on a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance.

*Amodeo II*, 71 F.3d at 1049. Thus, this Court has "explained that where documents are used to determine litigants' substantive legal rights, a strong presumption of access attaches." *Lugosch*, 435 F.3d at 121 (citing *Amodeo II*, 71 F.3d at 1049).

As this precedent makes clear, the determination of whether particular records are judicial documents and the weight of the presumption of access that attaches to them must be made on a case-by-case basis. This Court's approach to

11

determining whether a document is a judicial document "has been to emphasize the role of the document in the judicial process," *Erie Cty.*, 763 F.3d at 239, which will necessarily vary in each case. Similarly, a document's role in the court's exercise of its Article III powers and the importance of the document to the public's ability to monitor the federal courts, *Amodeo II*, 71 F.3d at 1049, will depend on the facts of a specific case. Thus, in determining whether the Discovery Motion Records are judicial records, the Court need not determine, as a matter of law, that all documents filed in connection with all discovery motions are or are not judicial records; rather, the Court should consider the role of these specific discovery motions and the Discovery Motion Records in the district court's performance of its Article III functions and the determination of the parties' substantive rights.

In some cases, discovery motions are directly relevant to the performance of the judicial function and directly affect an adjudication and the parties' substantive rights. "The manner in which [the discovery process] proceeds may prove decisive to the outcome of particular disputes." *Mokhiber v. Davis*, 537 A.2d 1100, 1112 (D.C. 1988). Litigants' ability to depose witnesses, compel production of documents, and otherwise seek out information through the discovery process can be critical to their litigation's success or failure. *See GMAC Bank v. HTFC Corp.*, 248 F.R.D. 182, 185 (E.D. Pa. 2008) (stating that "[m]ore than 98% of all civil cases filed in the federal courts result in disposition by way of settlement or pretrial

adjudication" and that "[v]ery often, these results turn on evidence obtained during depositions"); *Hall v. Clifton Precision*, 150 F.R.D. 525, 531 (E.D. Pa. 1993) (noting that "[d]epositions are the factual battleground where the vast majority of litigation actually takes place"). For example, the discovery process can have a significant effect on a party's ability to successfully move for summary judgment or induce pre-trial settlement. *U.S. for Use of Weston & Brooker Co. v. Continental Cas. Co.*, 303 F.2d 91, 92 (4th Cir. 1962); *see also Quela v. Payco-Gen. Amer. Credits, Inc.*, No. 99 C 1904, 2000 WL 656681, at *7 (N.D. Ill. May 18, 2000) ("Every day, litigants make settlement decisions on the basis of information obtained during the discovery process. Across the country, our fellow judges enter summary judgment in numerous cases on the basis of undisputed facts determined during the discovery process."). Thus, discovery and discovery motions can be central a case's disposition. *See* Richard L. Marcus, *The Discovery Confidentiality Controversy*, 1991 U. Ill. L. Rev. 457, 474–75 (1991).

In cases in which discovery motions are essentially dispositive of parties' substantive rights or directly affect the adjudication, access to the motions and their related documents is critical to the public's ability to monitor the judiciary's exercise of its Article III powers. Without such access, the public will be unable to determine whether a court is fairly and properly resolving discovery-related disputes. In these cases, discovery motions and records attached to discovery

13

motions are judicial records to which the common law presumption of access applies.

## III. The district court erred in treating Appellants' motion to unseal as a motion to modify a protective order.

*Amici* agree with Appellants that the district court erred by treating Appellants' January 19, 2017 motion to unseal records filed in support of and opposition to Defendant's motion for summary judgment as a motion to modify a protective order.[5] Rather than apply the standards governing the modification of a protective order, the district court should have applied the common law and First Amendment presumptions of access apply to Appellants' motion to unseal.

In evaluating Appellants' motion to unseal, the district court required Appellants to demonstrate "'improvidence in the grant of the protective order or some extraordinary circumstance or compelling need.'" District Court Opinion at 5 (quoting *In re Sept. 11 Litig.*, 262 F.R.D. 274 (S.D.N.Y. 2009)). This standard arises from this Court's opinion in *Martindell v. Int'l Tel. & Tel. Corp.*, 594 F.2d

---

[5] In a single paragraph in the district court's opinion denying the motion to unseal the district court "recognizes that there is generally a presumption of public access to judicial documents." Opinion at 9, *Giuffre v. Maxwell*, 15-cv-07433-RWS (May 3, 2017), ECF No. 892 ("District Court Opinion"). However, the district court's opinion does not engage in any meaningful analysis of the presumption of access or the competing values weighing in favor of access. The majority of the district court's analysis treats the motion to unseal as a motion to modify a protective order, concluding, "The motion to modify the Protective Order is denied." *Id.* at 10.

291 (2d Cir. 1979). In that case, the government sought access to discovery materials subject to a Rule 26(c) protective order in litigation between two private parties, to which the government was not a party. *Id.* at 293. This Court held that once a court has issued a Rule 26(c) protective order and the parties have reasonably relied upon it, it cannot be modified "absent a showing of improvidence in the grant of [the] protective order or some extraordinary circumstances or compelling need." *Id.* at 296.

The *Martindell* standard, however, does not apply to determinations to unseal judicial documents. Unsurprisingly, because *Martindell* involved a request for unfiled discovery materials, not judicial documents, it did not address the common law or First Amendment presumptions of access to judicial documents. Moreover, *Martindell* was decided decades before *Amodeo I* and *II*, in which this Court recognized the common law presumption of access to judicial documents. Since *Amodeo I* and *II* were decided, this Court has expressly clarified that *Martindell* applies *only* "in the case of documents that are *not* 'judicial documents.'" *SEC v. TheStreet.Com*, 273 F.3d 222, 234 (2d Cir. 2001) (emphasis added).

Here, Appellants' January 19, 2017 motion sought access to judicial documents to which the common law and First Amendment presumptions of access apply. *See Lugosch,* 435 F.3d at 121 (holding that "documents submitted to

a court for its consideration in a summary judgment motion are—as a matter of law—judicial documents to which a strong presumption of access attaches, under both the common law and the First Amendment"). Thus, the district court erroneously applied the legal standard applicable to Rule 26(c) protective orders governing discovery exchanged between parties in litigation, rather than the correct, far more stringent legal standards applicable to judicial documents to which the common law and First Amendment presumptions of access apply.

**IV.   The district court did not consider the public's significant and legitimate interest in access to the judicial records in this case.**

In denying Appellants' motions to unseal, the district court also did not consider the strong public interest in obtaining access to the judicial records in this case. *See Bernstein*, 814 F.3d at 143 (considering the public's interest in the subject matter of a civil complaint in determining weight of the presumption of access). The public has a legitimate interest judicial records concerning highly publicized allegations of sexual abuse and trafficking of minors. The interest is further heightened in this case, as various politicians and other prominent figures have been connected to Jeffrey Epstein, including President Donald Trump, former-President Bill Clinton, and Prince Andrew, Duke of York. *See, e.g.*, Jane Musgrave, *Will President Trump be used as witness in sex offender Epstein case?*, Palm Beach Post, May 12, 2017, https://perma.cc/GPA7-QRLR; Josh Gerstein, *The one weird court case linking Trump, Clinton, and a billionaire pedophile*,

16

Politico, May 4, 2017, https://perma.cc/8D55-QGJU; Josh Gerstein, *Woman who sued convicted billionaire over sex abuse levels claims at his friends*, Politico, Dec. 31, 2014, https://perma.cc/QWC9-A2FF; Tom Leonard, *Prince Andrew risks losing ambassador job as girl in underage sex case reveals meeting him*, Daily Mail, Mar. 2, 2011, http://dailym.ai/2wni8s1.

The judicial records in this case are also of significant public interest as the news media continues to report on ongoing controversies concerning Epstein's plea deal. In 2008, Epstein pled guilty certain state criminal charges and served a 13-month sentence, in exchange for an agreement by the federal government not to bring federal charges against him. Conchita Sarnoff, *Jeffrey Epstein, Billionaire Pedophile, Goes Free*, Daily Beast, July 20, 2010, https://perma.cc/HMC3-HQJG. The news media has reported extensively on the leniency of the plea deal, and Secretary of Labor Alexander Acosta, who was the United States Attorney for the Southern District of Florida at the time of Epstein's plea deal, was questioned about his role in the deal at his confirmation hearings earlier this year. Andrew Soergel, *Acosta Queried on Epstein, Hiring Scandal*, U.S. News & World Report, Mar. 22, 2017, https://perma.cc/7UEY-RTKT. In addition, a federal lawsuit brought by Epstein's victims that alleges that federal prosecutors violated the Crime Victim's Rights Act, 18 U.S.C. § 3771 by secretly negotiating Epstein's plea deal. *See Doe v. United States*, 9:08-cv-80736-KAM (S.D. Fla.). The

litigation is ongoing and continues to be the subject of news media reports. *See, e.g.*, Jane Musgrave, *Fight to reopen teen sex case against Jeff Epstein may set precedent*, Palm Beach Post, Aug. 26, 2017, https://perma.cc/7J3C-GPZF; Malia Zimmerman, *Lawsuit seeks to expose, unravel plea deal for billionaire sex offender*, Fox News, July 18, 2016, http://fxn.ws/2aomfuk.

In short, the allegations involved in this case have been covered extensively in the press and are of significant and legitimate public interest. The district court erred in ignoring this "broader context." *Lugosch*, 435 F.3d at 113, 123 n.5 (rejecting lower court's conclusion that public interest in a "dispute among business partners" did not add weight to presumption of access, noting the "broader context" of the case, *i.e.*, that defendants were "lobbying the state legislature and the governor to obtain preferred treatment in connection with a business endeavor that [was] similar to those at issue in this case").

## V.  No compelling or countervailing interest overcomes the public's First Amendment or common law rights of access to the sealed records.

Finally, had the district court properly applied the First Amendment and common law presumptions of access, it would have concluded that neither presumption of access was overcome. The First Amendment presumption is overcome only if "specific, on the record findings are made demonstrating that 'closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" *Press-Enter. v. Superior Court*, 478 U.S. 1, 13–14 (1986) (*Press-*

18

*Enterprise II*) (quoting *Press-Enterprise I*, 464 U.S. at 510). Similarly, under the common law presumption is overcome only by "specific findings" that "the interests favoring non-access outweigh those favoring access." *Amodeo I*, 44 F.3d at 148. "The burden of demonstrating that a document submitted to a court should be sealed rests on the party seeking such action . . . ." *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 826 (2d Cir. 1997).

The district court concluded that "[b]ecause of the sensitive nature of the materials designated as confidential, involving allegations of sexual abuse and trafficking of minors, and because we are mere weeks from assembling a jury for trial, the importance of leaving these materials protected by the Protective Order outweighs any public interest in their publication at this time." District Court Opinion at 9. *Amici* recognize that the need to protect sensitive and private information about minor victims of sexual abuse can be a compelling interest that may overcome the presumptions of access. However, the complete sealing of such records is not automatic. *See Globe Newspaper Co.*, 457 U.S. at 608 (holding that rule of court requiring automatic closure of the courtroom during the testimony of a minor sexual abuse victim was unconstitutional). Appellee made no showing that sealing is necessary to protect such information in this case. In addition, now that the parties have settled and dismissed the underlying lawsuit, *see* Joint Stipulation for Dismissal, *Giuffre v. Maxwell*, 15-cv-07433-RWS (May 25, 2017),

19

ECF No. 919, any concerns about assembling a jury cannot justify the continued sealing of the records Appellants seek.

Moreover, even assuming, *arguendo*, that some compelling or countervailing interest justified some sealing of judicial records, the sealing in this case was in no way narrowly tailored. Defendant's motion for summary judgment, Plaintiff's response, and Defendant's reply were entirely redacted, and most of the attached exhibits were filed under seal. *See Giuffre v. Maxwell*, 15-cv-07433-RWS, ECF Nos. 541, 542, 586, 620. It is difficult to imagine that such complete secrecy was necessary to protect any compelling interest in this case, especially given that many of the details have already been reported in the press, including through an on-the-record interview of Plaintiff. *See* Leonard, *supra*. Where "wholesale sealing of . . . papers [is] more extensive than necessary" to protect a compelling interest, the Second Circuit has instructed courts to consider more narrow options, such as "redaction of names and perhaps portions of [other] materials contained in the . . . papers." *In re N.Y. Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987). The district court erred in failing to consider such options.

## CONCLUSION

For the foregoing reasons and those set forth in Appellants' briefs, *amici curiae* urge this Court to reverse the district court's order and remand with instructions to grant the motions to unseal filed by Appellants.

20

Dated:  September 20, 2017   Respectfully Submitted,

     *s/Bruce D. Brown*

     Bruce D. Brown
     Gregg P. Leslie
     Caitlin Vogus
     THE REPORTERS COMMITTEE
     FOR FREEDOM OF THE PRESS
     1156 15th Street NW, Ste. 1250
     Washington, D.C. 20005
     (202) 795-9300

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) and L. Civil R. 29.1 because this brief contains 4,727 words, excluding

the parts of the brief exempted by Fed. R. App. P. 32(f).  This brief complies with

the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style

requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a

proportionally spaced typeface using Microsoft Word for Mac in 14-point, Times

New Roman font.

Dated:  September 20, 2017          By:  */s/ Bruce D. Brown* _____
                                         Bruce D. Brown
                                         *Counsel for Amici Curiae*

## APPENDIX A:  DESCRIPTION OF *AMICI*

The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors that works to defend the First Amendment rights and freedom of information interests of the news media. The Reporters Committee has provided assistance and research in First Amendment and Freedom of Information Act litigation since 1970.

With some 500 members, American Society of News Editors ("ASNE") is an organization that includes directing editors of daily newspapers throughout the Americas.  ASNE changed its name in April 2009 to American Society of News Editors and approved broadening its membership to editors of online news providers and academic leaders.  Founded in 1922 as American Society of Newspaper Editors, ASNE is active in a number of areas of interest to top editors with priorities on improving freedom of information, diversity, readership and the credibility of newspapers.

The Associated Press Media Editors is a nonprofit, tax-exempt organization of newsroom leaders and journalism educators that works closely with The Associated Press to promote journalism excellence.  APME advances the principles and practices of responsible journalism; supports and mentors a diverse network of current and emerging newsroom leaders; and champions the First Amendment and promotes freedom of information.

Association of Alternative Newsmedia ("AAN") is a not-for-profit trade association for 130 alternative newspapers in North America, including weekly papers like The Village Voice and Washington City Paper.  AAN newspapers and their websites provide an editorial alternative to the mainstream press.  AAN members have a total weekly circulation of seven million and a reach of over 25 million readers.

Bay Area News Group is operated by MediaNews Group, one of the largest newspaper companies in the United States with newspapers throughout California and the nation.  The Bay Area News Group includes *The Oakland Tribune*, *The Daily Review*, *The Argus*, *San Jose Mercury News*, *Contra Costa Times*, *Marin Independent Journal*, *West County Times*, *Valley Times*, *East County Times*, *Tri-Valley Herald*, *Santa Cruz Sentinel*, *San Mateo County Times*, *Vallejo Times-Herald* and *Vacaville Reporter*, all in California.

Daily News, LP publishes the New York Daily News, a daily newspaper that serves primarily the New York City metropolitan area and is the ninth-largest paper in the country by circulation.  The Daily News' website, NYDailyNews.com, receives approximately 26 million unique visitors each month.

The E.W. Scripps Company serves audiences and businesses through television, radio and digital media brands, with 33 television stations in 24 markets. Scripps also owns 33 radio stations in eight markets, as well as local and national digital journalism and information businesses, including mobile video news service Newsy and weather app developer WeatherSphere. Scripps owns and operates an award-winning investigative reporting newsroom in Washington, D.C. and serves as the long-time steward of the nation's largest, most successful and longest-running educational program, the Scripps National Spelling Bee.

First Amendment Coalition is a nonprofit public interest organization dedicated to defending free speech, free press and open government rights in order to make government, at all levels, more accountable to the people. The Coalition's mission assumes that government transparency and an informed electorate are essential to a self-governing democracy. To that end, we resist excessive government secrecy (while recognizing the need to protect legitimate state secrets) and censorship of all kinds.

First Look Media Works, Inc. is a new non-profit digital media venture that produces The Intercept, a digital magazine focused on national security reporting.

Gannett Co., Inc. is an international news and information company that publishes 109 daily newspapers in the United States and Guam, including USA TODAY. Each weekday, Gannett's newspapers are distributed to an audience of more than 8 million readers and the digital and mobile products associated with the company's publications serve online content to more than 100 million unique visitors each month.

The International Documentary Association (IDA) is dedicated to building and serving the needs of a thriving documentary culture. Through its programs, the IDA provides resources, creates community, and defends rights and freedoms for documentary artists, activists, and journalists.

The Investigative Reporting Workshop, a project of the School of Communication (SOC) at American University, is a nonprofit, professional newsroom. The Workshop publishes in-depth stories at investigativereportingworkshop.org about government and corporate accountability, ranging widely from the environment and health to national security and the economy.

MPA - The Association of Magazine Media, ("MPA") is the largest industry association for magazine publishers. The MPA, established in 1919, represents over 175 domestic magazine media companies with more than 900 magazine titles. The MPA represents the interests of weekly, monthly and quarterly publications that produce titles on topics that cover politics, religion, sports, industry, and

24

virtually every other interest, avocation or pastime enjoyed by Americans. The MPA has a long history of advocating on First Amendment issues.

The National Press Photographers Association ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing and distribution. NPPA's approximately 7,000 members include television and still photographers, editors, students and representatives of businesses that serve the visual journalism industry. Since its founding in 1946, the NPPA has vigorously promoted the constitutional rights of journalists as well as freedom of the press in all its forms, especially as it relates to visual journalism. The submission of this brief was duly authorized by Mickey H. Osterreicher, its General Counsel.

New England First Amendment Coalition is a non-profit organization working in the six New England states to defend, promote and expand public access to government and the work it does. The coalition is a broad-based organization of people who believe in the power of transparency in a democratic society. Its members include lawyers, journalists, historians and academicians, as well as private citizens and organizations whose core beliefs include the principles of the First Amendment. The coalition aspires to advance and protect the five freedoms of the First Amendment, and the principle of the public's right to know in our region. In collaboration with other like-minded advocacy organizations, NEFAC also seeks to advance understanding of the First Amendment across the nation and freedom of speech and press issues around the world.

Online News Association ("ONA") is the world's largest association of online journalists. ONA's mission is to inspire innovation and excellence among journalists to better serve the public. ONA's more than 2,000 members include news writers, producers, designers, editors, bloggers, technologists, photographers, academics, students and others who produce news for the Internet or other digital delivery systems. ONA hosts the annual Online News Association conference and administers the Online Journalism Awards. ONA is dedicated to advancing the interests of digital journalists and the public generally by encouraging editorial integrity and independence, journalistic excellence and freedom of expression and access.

Radio Television Digital News Association ("RTDNA") is the world's largest and only professional organization devoted exclusively to electronic journalism. RTDNA is made up of news directors, news associates, educators and students in radio, television, cable and electronic media in more than 30 countries. RTDNA is committed to encouraging excellence in the electronic journalism industry and upholding First Amendment freedoms.

Society of Professional Journalists ("SPJ") is dedicated to improving and protecting journalism. It is the nation's largest and most broad-based journalism organization, dedicated to encouraging the free practice of journalism and stimulating high standards of ethical behavior. Founded in 1909 as Sigma Delta Chi, SPJ promotes the free flow of information vital to a well-informed citizenry, works to inspire and educate the next generation of journalists and protects First Amendment guarantees of freedom of speech and press.

The Tully Center for Free Speech began in Fall, 2006, at Syracuse University's S.I. Newhouse School of Public Communications, one of the nation's premier schools of mass communications.

## APPENDIX B: ADDITIONAL COUNSEL

Kevin M. Goldberg
Fletcher, Heald & Hildreth, PLC
1300 N. 17th St., 11th Floor
Arlington, VA 22209
*Counsel for American Society of News Editors*
*Counsel for Association of Alternative Newsmedia*

Marshall Anstandig
Senior VP/General Counsel
Bay Area News Group
750 Ridder Park Drive
San Jose, CA 95190
James Chadwick
Sheppard Mullin Richter & Hampton LLP
390 Lytton Avenue
Palo Alto, CA 94301
*Additional Counsel for Bay Area News Group*

Matthew Leish
Vice President & Deputy General Counsel
Daily News, LP
4 New York Plaza
New York, New York 10004

David M. Giles
Vice President/
Deputy General Counsel
The E.W. Scripps Company
312 Walnut St., Suite 2800
Cincinnati, OH 45202

David Snyder
First Amendment Coalition
534 Fourth St., Suite B
San Rafael, CA 94901

David Bralow
First Look Media Works, Inc.
18th Floor
114 Fifth Avenue
New York, NY 10011

Barbara W. Wall
Senior Vice President & Chief Legal Officer
Gannett Co., Inc.
7950 Jones Branch Drive
McLean, VA 22107
(703)854-6951

James Cregan
Executive Vice President
MPA - The Association of Magazine Media
1211 Connecticut Ave. NW Suite 610
Washington, DC 20036

Mickey H. Osterreicher
1100 M&T Center, 3 Fountain Plaza,
Buffalo, NY 14203
*Counsel for National Press Photographers Association*

Robert A. Bertsche (BBO #554333)
Prince Lobel Tye LLP
100 Cambridge Street
Boston, MA 02114
*Counsel for the New England First Amendment Coalition*

Laura R. Handman
Alison Schary
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue, NW
Suite 800
Washington, DC 20006
Thomas R. Burke
Davis Wright Tremaine LLP
Suite 800
500 Montgomery Street
San Francisco, CA 94111
*Counsel for Online News Association*

Kathleen A. Kirby
Wiley Rein LLP
1776 K St., NW
Washington, DC 20006
*Counsel for Radio Television Digital News Association*

Bruce W. Sanford
Mark I. Bailen
Baker & Hostetler LLP
1050 Connecticut Ave., NW
Suite 1100
Washington, DC 20036
*Counsel for Society of Professional Journalists*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the United

States Court of Appeals for the Second Circuit by using the appellate CM/ECF

system on September 20, 2017.


Dated:  September 20, 2017          By:  */s/ Bruce D. Brown*
                                        Bruce D. Brown
                                        *Counsel for Amici Curiae*